SHUTTE v. THOMPSON.

1. Although the formalities prescribed by the 30th section of the act of Congress of September 2d, 1789 (1 Stat. at Large, 88), authorizing the taking of depositions *de bene esse* in certain cases and stating the circumstances under which, and the mode in which they may be taken, must be strictly observed (the act itself being in derogation of the common law), yet a party may waive any provisions intended for his benefit. And in regard to this statute he will be held to have waived them if he

refrained, at a time when they might be removed and until after possibility of such removal had ceased, from making objections that provisions intended for his benefit were not complied with: and in fact consent that the deposition should be taken and returned to court as it was.

2. Hence if it appear that the witness examined was an aged man when his deposition was taken; that he had died before the trial; that one of the counsel of the opposite party had accepted notice of taking the deposition; that he had attended at the taking, and cross-examined the witness; that he made no objection either to the sufficiency of the oath, to the reasons for taking the deposition, or to the competency of the magistrate; and that, though the deposition had been filed in the record of the cause more than a year before the trial, no exception had been taken to it in all that time, consent to the manner of taking the deposition must be presumed: and the admission of the deposition in evidence will be held good even though it may not have been taken in all the modes prescribed by the act of Congress, to give security to the party against whom it is meant to be used.

3. In the case of a deed made by a grantor non-resident of Virginia, it is sufficient to allow a proper record of it under the Virginia statute of December 8th, 1792, that there be a certificate of the clerk of a District Court of the United States that the grantor personally appeared in court and acknowledged the instrument to be his free act and deed; this being accompanied by a certificate of even date, by the judge of the same court, that the clerk was then the officer that he professed to be.

4. In questions of boundary, reputation in the neighborhood at the present day is not admissible, unless it be traditionary, or derived from ancient sources, or from those who had peculiar means of knowing what the reputation of the boundary was in an ancient day.

5. A title to land in West Virginia assumed to have been made under the 37th chapter of the Virginia Code relating to sales of land for non-payment of taxes, which chapter, by the constitution of West Virginia and otherwise, was part of its laws, and was to remain in force after the creation of the latter State until repealed by it, was no title at all after the 27th of February, 1866; the entire said 37th chapter having on that day been repealed by the legislature of West Virginia.

6. Where no request is made for specific instructions and no error is perceived in the instructions actually given, the fact that the charge may not have covered the entire case is not ground for reversal.

ERROR to the District Court for the District of West Virginia:

Thompson brought ejectment, A.D. 1859, in the court below against Shutte for four conterminous tracts of land of 1000 acres each, situate in West Virginia. The plaintiff's

title originated in a grant made in the year 1787, by the State of Virginia, to one Jabez Bacon, who subsequently died leaving eight children, his heirs; among them one named Nathaniel. The grant to Jabez Bacon embraced twenty-one tracts of land, including the land now in controversy, and, as the tracts adjoined each other, it was, in substance, a grant of one body containing 20,000 acres, to the right of Bacon in which the plaintiff asserted that he had succeeded in virtue of sundry mesne conveyances. But it was admitted by the plaintiff in the outset of the case that all the deeds through which he claimed could not be produced; it being alleged that most of the originals were lost; several never having been even recorded. Among the instruments which were produced was a certified *copy* from the county records of a deed from Nathaniel Bacon (*one* of the eight sons of Jabez Bacon, the original grantee of the Commonwealth), to Philo Murray, of 1815; a like *copy* of a deed from Philo Murray to Peter Smith, of 1815; with original deeds from Gerrit Smith and other heirs of Peter Smith to the Oberlin College, of 1853; and from the Oberlin College to Uriah Thompson, of 1854. Assuming the copies to have been as good evidence as the originals (a matter denied by the defendant), the apparent defect in the plaintiff's title here, of course, was that but $\frac{1}{8}$ of Jabez Bacon's title had been vested in the plaintiff, and this was a matter which made a great question in the case. To get over this apparent defect, the plaintiff produced testimony of one Underwood and others to show that there had formerly existed in the possession of the treasurer of Oberlin College "twenty patents from the State of Virginia to Jabez Bacon for the 20,000 acres of land, and of *several* intermediate deeds by which said land was ultimately conveyed by Gerrit Smith to Oberlin College; deeds by *several men of the name of Bacon*, and Philo Murray, and Smith." These deeds, according to the testimony, had been sent by the treasurer of the college to an agent of it to effect a sale of part of the lands, which he did, and could not be found. This evidence was fortified by evidence that the heirs of

Jabez Bacon, in conversation about the land, never claimed any part of it; and that the Smiths from 1815 to 1823, and Oberlin College till its sale to the plaintiff in 1854, had paid the taxes; and that the parties paying taxes had unchallenged possession from 1823 till the date of this suit.

The defence was professedly a grant by the State of Virginia prior to that one to Jabez Bacon, and some other defences, arising under the tax laws of Virginia; but one great effort on the trial was to prevent the plaintiff from showing a title in himself; without which, of course, he could not recover in ejectment.

In the course of the trial, bills of exception were taken by the defendant to the admission of certain evidence offered by the plaintiff, and to the exclusion of certain other evidence offered by himself: and also to the charge of the court.

The first exception was to the admission by the court of the deposition of Underwood, already named; taken professedly under the 30th section of the act of Congress of September 2d, 1789.* This act authorizes the deposition of an ancient, or any infirm person (among others), to be taken *de bene esse*, when the testimony of such person is needed in any civil cause depending in any district in any court of the United States. The deposition may be taken before any justice or judge of any of the courts of the United States, or before any chancellor, justice, or judge of a supreme or superior court, mayor or chief magistrate of a city, or judge of a county court or court of common pleas of any of the United States, not being of counsel or attorney to either of the parties, or interested in the event of the cause. The act further provides for notice to the adverse party, and enacts that every person deposing as aforesaid shall be carefully examined and cautioned and sworn or affirmed to testify the whole truth. It also further enacts that the depositions taken shall be retained by the magistrate until he deliver the same with his own hand into the court for which they

---

* 1 Stat. at Large, 88.

are taken, or shall, together with a certificate of the reasons of their being taken, and of the notice, if any, given to the adverse party, be by the magistrate sealed up and directed to the court, and remain under his seal until opened in court. In the present case the deposition had not been taken in conformity with these requirements; that is to say, it did not appear that the witness was sworn to testify the whole truth. Nor did it appear that there was any certificate of the reasons why the deposition was taken. In addition to this, it was taken before a township justice, and not by any magistrate described in the act of Congress. And on these accounts alone the defendant objected to its admission. The court, however, admitted it. In doing so it assigned as reasons " that it appeared that the deposition was filed in the papers of the cause more than one year before the trial thereof, and that no exceptions had been taken or indorsed thereon; that the witness was an aged man when his deposition was taken, and had died before the trial, and that no exceptions, verbal or otherwise, were taken until the deposition was offered in evidence by the plaintiffs; and because it further appeared that one of the counsel of the defendant had accepted notice for taking the deposition, and had appeared at the taking thereof, and cross-examined the witness, as was shown by the deposition;" and, as respected the character of the magistrate, " because the court, taking judicial cognizance of the acts of Assembly of West Virginia (from which it appears that a justice is required by law to keep a record of all his proceedings), and taking further notice of his power to impanel a jury to try causes before him, and that appeals will lie from his decisions, upon which transcripts of his record are evidence in the court, was, for these reasons, of opinion that he is ' a judge of a court within the meaning of this act of Congress relative to the taking of depositions *de bene esse.*' "

In the further progress of the trial, the plaintiff offered in evidence the *record* of two deeds; one from Nathaniel Bacon to Philo Murray, and the other from this Murray to Peter Smith, the grantors in both cases being residents of Connec-

ticut, and both deeds being acknowledged in the exact same way. The defendant objected to the admission of the records, because it appeared from them that the deeds had not been acknowledged as deeds made by persons resident out of the State of Virginia as required by its statutes to be, and because, therefore, the record of them was null.

To understand the force of the objection, it is necessary to state, that a statute of Virginia, passed December 8th, 1792, enacts that a deed acknowledged by persons residing in any of the United States, before any court of law, and certified by the court, shall be admitted to record, a copy of which shall be evidence.

The acknowledgment was thus in the first of these two deeds; *mutanda mutatis* in the second.

UNITED STATES OF AMERICA,
    DISTRICT OF CONNECTICUT, *ss.*:

At a District Court of the United States, held at New Haven, within and for said district, on the 4th Tuesday of February, A. D. 1817—present, the Honorable Pierpont Edwards, Judge—personally appeared Nathaniel Bacon, signer and sealer of the within instrument, and acknowledged the same to be his free act and deed. In witness whereof I have hereunto set my hand and affixed the seal of said court, at New Haven, the 26th day of February, A. D. 1817.

[SEAL.]                                    H. W. EDWARDS,
                                                    Clerk.


I, Pierpont Edwards, judge of said court, hereby certify that said H. W. Edwards is clerk of said court. In witness whereof I have hereunto set my hand the day above written.

                                        PIERPONT EDWARDS,
                                                    District Judge.

In the further progress of the trial, the defendant gave in evidence plats and certificates of thirty-three surveys made in 1785, for one Thomas Laidley, one survey for William Barclay, one for John Lyne, one for Richard Mason, one for Joshua Jackson, and five patents to John Reed, the object being to show the location of the patents. Further, to identify them,

he offered to prove by a witness who had lived many years in the neighborhood of Thomas Laidley's survey No. 1, that a poplar corner represented on the plat was, and had been for many years, known and reported in the neighborhood as the poplar beginning corner of Laidley's survey. To this the plaintiffs objected, and the court refused to allow proof " of the reputation of the neighborhood as to the said poplar corner at the present day, unless such reputation was tradi- tionary in its character, having passed down from those who were acquainted with the reputation of the tree from an early day to the present time," or unless "the information as to such reputation was derived from ancient sources, or from persons who had peculiar means of knowing what the reputation of the tree was at an early day." But the court permitted the defendant to prove that the occupants of the Laidley survey No. 1, and of the Mason tract adjoining thereto (the poplar being a corner of each), claimed the pop- lar as the true corner of their tracts. To this ruling of the court the defendant excepted; and this made the fourth bill of exceptions.

In the further progress of the case, the defendant offered in evidence a tax deed for the lands from the recorder of Doddridge County, one Taliaferro Knight, to John S. Hoff- man, the purpose of the evidence being apparently to show title out of the plaintiff. The deed was dated on the 26th of March, 1866, and showed, by its recitals, that the land was returned delinquent for the non-payment of taxes for the year 1857, and was sold in 1860, to Hoffman, in virtue of the 37th chapter of the Code of Virginia of which West Virginia was then a part. That chapter allowed two years for redemp- tion, and after their expiration the purchaser was obliged to have a survey made and reported to the court of the proper county, which, if approved, the court might order to be recorded. The clerk was required then to make a deed to the purchaser, in conformity with the survey. No sale could be consummated, and no deed could be made prior to the return, confirmation, and record of such survey. In 1863 West Virginia became a separate State, and by virtue of a

clause in its constitution, the laws of Virginia continued in force until changed by the West Virginia legislature. On the 27th of February, 1866, that legislature passed an act by which the entire 37th chapter of the Virginia Code was repealed so far as it applied to tax sales of lands in West Virginia.*

The court rejected the deed offered in evidence, and this made another of the exceptions.

The trial being closed, the court charged the jury; *the defendant asking no specific instructions on any point,* and no instructions being given as to the matter of how far the seven-eighths of the title of Jabez Bacon, for which no deeds, or copies of deeds, were produced, was to be presumed to be vested in the plaintiff. Verdict and judgment were given for the plaintiff, and the defendant brought the case here on error. The case being now in this court, the defendant in the case below, and now plaintiff in error here, contended that the instructions given were insufficient; his point as expressed in his brief being that they "did not clearly and correctly expound the law of the case."

*Mr. C. Boggess (a brief of Mr. John S. Hoffman being filed) for the plaintiff in error; Mr. B. H. Smith, contra.*

Mr. Justice STRONG delivered the opinion of the court.

The first error assigned is the decision of the court admitting the deposition of Underwood.

It must be admitted that the deposition was not taken in conformity with all the regulations of the act of Congress of September 24th, 1789. It does not appear that the witness was sworn to testify, the whole truth. Nor does it appear that there was any certificate of the reasons why the deposition was taken. In addition to this it was taken before a township justice, and not by any magistrate described in the act of Congress, and for these reasons the

---

* Acts of Legislature, 1866, p. 85.

opposition to its reception in evidence was founded. No other reason was stated in the court below, and no others are urged in this court.

It is to be observed that the objections made are all formal rather than substantial. Still they are quite sufficient to require the rejection of the deposition, if there is nothing in the case to countervail their effect. But it is obvious that all the provisions made in the statute respecting notice to the adverse party, the oath of the witness, the reasons for taking the deposition, and the rank or character of the magistrate authorized to take it, were introduced for the protection of the party against whom the testimony of the witness is intended to be used. It is not to be doubted that he may waive them. A party may waive any provision, either of a contract or of a statute, intended for his benefit. If, therefore, it appears that the plaintiff in error did waive his rights under the act of Congress—if he did practically consent that the deposition should be taken and returned to the court as it was—and if by his waiver he has misled his antagonist—if he refrained from making objections known to him, at a time when they might have been removed, and until after the possibility of such removal had ceased, he ought not to be permitted to raise the objections at all. If he may, he is allowed to avail himself of what is substantially a fraud. Parties to suits at law may assert their rights to the fullest extent; but neither a plaintiff nor a defendant is at liberty to deceive, either actively or passively, his adversary, and a court whose province it is to administer justice, will take care that on the trial of every cause neither party shall reap any advantage from his own fraud.

In this case it appeared to the court below, as the record states, that Underwood was an aged man when his deposition was taken; that he had died before the trial; that one of the counsel for the defendant (now plaintiff in error) had accepted notice of taking the deposition; that he had attended at the taking, and cross-examined the witness; that he made no objection either to the sufficiency of the oath, to the reasons for taking the deposition, or to the com-

petency of the magistrate; and that, though the deposition
had been filed in the record of the cause more than a year
before the trial, no exception had been taken to it in all that
time.  Under these circumstances, the consent of the de-
fendant to the manner of taking the deposition must be
presumed, or a fraudulent attempt to mislead the plaintiff
must be conceded.  It has been decided that objections to
the competency of a witness must be made at the time of
taking his deposition, if the party objecting attended, and
the objections were then known by him, in order that his
opponent may remove them, and that if he does not then
object he will be presumed to have waived objection.*

The reason is that unless such presumption is made, fraud
and trickery must be imputed to the objecting party.  There
is at least equal reason for presuming the consent of the de-
fendant, that the deposition of Underwood should be taken
before the magistrate who took it, and in the manner in
which it was taken.  In *York Company* v. *Central Railroad
Company*,† it was said that when a deposition has been taken
under a commission the general rule is, that all objections
of a formal character, and such as might have been urged
on the examination of the witness, must be raised at such
examination, or upon motion to suppress the deposition.
In *Buddicum* v. *Kirk*,‡ it appeared that a deposition had been
taken under a "*dedimus potestatem*."  Notice had been given
to the plaintiff's attorney that it would be taken on the 8th
of August, and, if not taken in one day, that the commis-
sioners would adjourn from day to day until it should be
finished.  The attorney agreed that it might be taken on
that day whether he attended or not.  The commissioners
met on the 8th of August, and adjourned from day to day
until the 12th, when they adjourned until the 19th, and then
took the deposition.  There was no attendance of the plain-
tiff's attorney, and he had no notice of the several adjourn-
ments, yet this court held that the agreement of the attorney
that the deposition might be taken whether he was present

---

* United States *v.* One Case of Hair Pencils, 1 Paine, 400.
† 3 Wallace, 113.                      ‡ 3 Cranch, 293.

or not, his subsequent examination of it without objecting
to the want of notice, and the death of the witness, were
sufficient grounds for the defendant to believe that the ob-
jection would be waived, and the deposition was ruled to
be admissible.  This, it is true, was not the case of a depo-
sition taken "*de bene esse*," but it shows that formal errors
and defects in taking depositions may be waived, and it
shows that much less than appears in the present case will
be held to be sufficient evidence of a waiver.  See, also,
*Rich* v. *Lambert*,* where it was ruled that the absence of an
order for issuing a commission is waived by joining in ex-
ecuting the commission.  In that case the thing waived was
absence of authority to take the deposition.

It must be conceded that the authority to take depositions
*de bene esse*, under the 30th section of the act of 1789, has
always been construed strictly.  Being in derogation of the
rules of common law, the formalities prescribed by the act
must be observed; and many cases may be found in which
such depositions have been rejected, because it did not ap-
pear that the required conditions or formalities had been
regarded.  They are all, however, cases in which the party
objecting did not attend the examination of the witness, or
took no part in it.  They are all consistent with the rule,
that a party may waive any conditions that are intended for
his sole benefit, and that he does waive every formal objec-
tion when he attends the examination of a witness, cross-
examines without protest, and remains silent until the wit-
ness has died.  Such was the case here.  The deposition
shows that the attorney of the objecting party attended
before the magistrate, that he took part in examining the
witness, and that he never made objection until more than
a year afterwards, when the witness was dead, and when
the case came to trial.  All these facts appeared to the court
below, and they were not controverted.  Under the circum-
stances, therefore, we think the deposition was correctly
received by the court, and that this assignment of error
cannot be sustained.

--------------------------------------------------------------
* 12 Howard, 354.

The next error assigned is the admission by the court of the exemplifications of the record of a deed from Nathaniel Bacon, a son and heir of Jabez Bacon, to Philo Murray, and of the record of a deed from Philo Murray to Peter Smith. It is alleged that the deeds had not been recorded in compliance with the statutes authorizing deeds made out of the State to be recorded. The objection, we think, is founded upon a mistake of facts. The grantors were both residents in the State of Connecticut, and to each deed there was a certificate of the clerk of the District Court of the United States that the grantor therein named personally appeared in the court, and acknowledged the instrument to be his free act and deed. There is also a certificate of the judge, dated the day of the clerk's certificate, that the clerk was then clerk of the District Court. Probate was thus made strictly in accordance with the Virginia statute of December 8th, 1792. The deeds were therefore entitled to record, and they were duly recorded in pursuance of orders of the county court.* Hence there was no error in admitting the exemplifications in evidence.

We pass now to consider the fourth bill of exceptions. The court refused to allow proof of the reputation of the neighborhood as to a poplar corner at the present day, "unless such reputation was traditionary in its character, having passed down from those who were acquainted with the reputation of the tree from an early day to the present time," or unless "the information as to such reputation was derived from ancient sources, or from persons who had peculiar means of knowing what the reputation of the tree was at an early day." But the court permitted the defendant to prove that the occupants of the Laidley survey No. 1, and of the Mason tract adjoining thereto (the poplar being a corner of each), claimed the poplar as the true corner of their tracts. To this ruling of the court the defendant excepted.

We do not perceive that any injury could have been sustained by the defendant in consequence of this ruling, even

* Smith v. Chapman, 10 Grattan, 452; Hassler v. King, 9 Id. 115.

Opinion of the court.

if it was incorrect; certainly none that would justify our sending the case to a new trial. But there was no error. Reputation as to the existence of particular facts not of a public nature, is not generally admissible, though where the existence of the facts have been proved *aliunde*, reputation is sometimes received to explain them.*  Here, however, the evidence was offered not to explain a fact, but to establish it. We do not propose to discuss this subject at length. It is sufficient to say that the limitations imposed by the court upon the evidence of reputation offered, are fully sustained by authority.†

The next error of which complaint is made, is that the court refused to permit the defendant to give in evidence a tax deed for the lands from Taliaferro Knight, recorder of Doddridge County, to John S. Hoffman. It seems to have been offered to show title out of the plaintiff. The deed bears date on the 26th day of March, 1866. From the recitals contained in it, we are informed that the land was returned delinquent for the non-payment of taxes for the year 1857, and that it was sold in the year 1860, to John S. Hoffman. The sale was made in force of the laws of Virginia, of which West Virginia was then a part.‡  By that statute two years were allowed for redemption, and after they had expired, the purchaser was required to have a survey made and reported to the court of the proper county, which, if approved, the court might order to be recorded. After all this had been done, the clerk was required to make a deed to the purchaser, in conformity with the survey. No sale could be consummated, and no deed could be made, prior to the return, confirmation, and record of such survey. It is important to keep these provisions of the law in mind, for in 1863 West Virginia became a separate State. By virtue of a clause in its constitution, as well as without such ordinance, the laws of Virginia continued in force until changed by the West Vir-

* 1 Greenleaf on Evidence, § 138.

† 1 Starkie on Evidence, ch. 3d, passim.

‡ Chapter 37, Civil Code.

ginia legislature. But that legislature, on the 27th of February, 1866, passed an act by which the entire thirty-seventh chapter of the Virginia statutes was repealed so far as it applied to tax sales of lands in West Virginia.* At that time the deed to Hoffman had not been made, nor had the survey of the land been made and reported. This appears from the deed itself. It is plain, therefore, that there was no authority for the survey and report, or for the deed. Without the statute in existence when they were made, they could have no efficacy. As transmissions of title they were wholly void. The deed was therefore properly rejected.

There remains one more exception to be considered. It is to the charge of the court in answer to the request of the jury for instructions. It is, however, unnecessary to examine critically the charge. If we understand the complaint of the plaintiff in error, it is 'not so much that erroneous instructions were given, as that the court failed to give the directions which it is now contended should have been given. The point made in the brief of the plaintiff in error is, that "the instructions given to the jury by the court, did not clearly and correctly propound the law of the case." There were, however, no requests for specific instruction, and it is abundantly settled that error cannot be assigned for failure to give instructions that were not asked. The portion of the charge excepted to, may not have covered the whole case. It probably did not. But so far as given, we discover in it no erroneous directions. It is true that, under the statutes of the State, the claimant, in order to take the forfeited title, must have had an apparent title, or color of title, regularly derived from the Commonwealth, acquired legitimately, and must have discharged the State's lien for taxes. This does not seem to have been contested. It certainly was not denied by the court. The main controversy evidently was over the question whether the whole title of Jabez Bacon has become vested in the plaintiff. A deed from only one of his children appears to have been given in

---

* Acts of Legislature, 1866, p. 85.

evidence.   But the loss of many title papers was proved. The heirs of Bacon made no claim, and disclaimed all intention of claiming.   The plaintiff, and those under whom he claimed, had taken charge of the land, and kept it from 1815 till 1839, paying taxes.   Then all the heirs of Smith quitclaimed to the Oberlin Collegiate Institute, whose title the plaintiff has.   From 1826, possession has attended the claim, without challenge.   Whether these facts, and others of which evidence was given, justified a presumption of a grant from the other heirs of Bacon was, of course, a question for the jury, in regard to which no instruction to the jury was asked.   Nor are we informed what directions, if any, were given.   In this part of the case there is, consequently nothing for us to review.   And in the part of the charge to which exception was taken, we perceive no error.

JUDGMENT AFFIRMED.