## RICKERT v. THOMPSON et al.

No: 3524.

Fourth Division.

June 14, 1933.

400

Albrecht and Taylor, of Fairbanks, for plaintiff.
Louis K. Pratt, of Fairbanks, for defendant.

HILL, District Judge.

This suit was brought by the plaintiff to quiet her title to certain placer mining ground described in her complaint, to which she claims title based upon a location thereof made by her October 19, 1931, as creek claim No. 6 above Discovery, Cleary creek, in the Fairbanks recording precinct, Fourth judicial division, territory of Alaska. The evidence shows, and plaintiff admits, that a claim of the same name covering at least a major portion of the same ground was located in 1902 and was kept alive by compliance with the mining law relative to assessment work until 1928, and that prior to 1907 the then owner of that claim joined in selling as a divided interest the lower or downstream half thereof, and that defendant Jesse Noble, then the owner of claims 7 and 8 above Discovery on Cleary creek, which adjoin one another and are the next claims lying upstream from claim No. 6 above, which is in dispute,

acquired title to both the upper and lower halves of No. 6 above. On October 22, 1907, defendant Jesse Noble was the owner of all of the original location of No. 6 above. At that time he was the husband of defendant Nellie Thompson and one of the stockholders of the Dome City Bank of which defendant Nellie Thompson's two sisters were the principal stockholders and one of her said sisters, Margaret C. Mulrooney, was cashier and secretary. Prior to her marriage to Noble, defendant Nellie Thompson had loaned the bank $3,000, which had been used in the purchase of equipment, and she had a desk in the bank and was employed in various capacities. She testified that her earnings were collected by the bank and, except what she used for her personal expenses, were used by the bank. She was not a stockholder in the bank, but was, she says, "interested in making a go of it" and desirous of helping her sisters with whom her relations were "exceedingly confidential and close." About November 1, 1907, Noble purchased from defendant Nellie Thompson's sisters their stock in the bank. From the evidence it appears that the sisters insisted upon payment of defendant Nellie Thompson's claim against the bank as a condition of the sale, and to that end defendant Nellie Thompson was paid $1,000 in cash, and Jesse Noble deeded to her an undivided half of the lower half of No. 6 above on Cleary creek and other mining interests on Dome creek. One of defendant Nellie Thompson's sisters, Margaret C. Mulrooney, who had been cashier and secretary of the bank, arranged for this deed, and executed it on behalf of Jesse Noble under a power of attorney which was introduced in evidence, and, according to defendant Nellie Thompson's testimony, which I believe, Noble in person at that time directed Margaret C. Mulrooney to go to Fairbanks where their lawyer resided and the recording office was situated and execute the deed. Fairbanks was approximately twenty miles from Dome City. Defendant Nellie Thompson appears to have left the details of her settlement to her sisters, and she did not go to Fairbanks to receive the deed, but her sister executed it

and filed it for record, and it was later given to defendant Nellie Thompson and is introduced in evidence here. Defendant Nellie Thompson says that, at the time of the negotiations and when it was decided that she should receive these interests in mining property in payment of her claim against the bank, she asked about annual assessment work on the mining interests she was to receive, including No. 6 above on Cleary creek, and that as part of the consideration and to induce her to accept those mining interests the defendant Noble agreed to keep up the assessment work for her until the claims were sold. Defendant Noble denies that he made any such agreement; in fact, he undertakes to repudiate the whole transaction, and claims that he did not take part in making any agreement whereby he deeded to defendant Thompson the interest she claims in No. 6 above. His explanation of the recorded deed is that it was made by Margaret C. Mulrooney, his attorney in fact, without his knowledge, and he placed in evidence certain files in a suit brought by him within a few days after said deed was made wherein he sought to set aside said deed. That suit was dismissed by stipulation within twenty days after it was brought, and defendant Noble claims that as part consideration for dismissing it defendant Thompson handed him a document, which he offered in evidence, and said that was the deed that she got and it had not been filed and that would straighten it up. He claims that he understood from that time on that he owned all of No. 6 above; hence he made no claim upon defendant Thompson for assessment work.

■■ Defendant Thompson's testimony that she had loaned her sisters $3,000 to equip the bank at Dome City is not categorically denied by defendant Noble. I find unbelievable his testimony that he believed that the interest in No. 6 was returned to him. He was a businessman, banker, and miner, had the advice of competent lawyers in the very matter under investigation, who drew up the stipulation dismissing his action referred to above against defendant

Thompson and her sisters, and certainly he could not have believed that title could be transferred by having returned to him a recorded deed. Furthermore, the very instrument handed to him was offered here in evidence and showed upon its face that it was a carbon copy and not an original, and for that reason as well as because it could not transfer title its admission was refused. So far as it appears, defendant Noble had good eyesight, and he must have known the difference between an original and a carbon copy. In this and other particulars referred to hereafter, I find his testimony unworthy of belief. While defendant Thompson's testimony as to defendant Noble's agreement to do assessment work on her interests until sold is not so convincing that I would not have welcomed other proof of that arrangement, there is nothing inconsistent about it. She had received undivided interests in unpatented mining claims; she was married to defendant Noble and to become a mother within approximately a month; she was giving up a claim for cash earned by her against a bank and accepting for that claim interests in mining locations of uncertain value; and she had lived in a mining community at least long enough to know of the danger of losing her interests in those claims if the assessment work was not done on them. Therefore it seems perfectly natural that before consenting to accept these interests she should take into consideration the necessity of assessment work and the further fact that she would probably not thereafter be in a position to earn money, and it is perfectly natural that her then husband, the defendant Noble, should have agreed, as she says he did, to keep up that work until the ground was sold. I therefore find that he did so agree. This finding disposes of the question of law raised in the earlier stages of this case as to the effect of assessment work done on one portion of a divided location in keeping alive the segregated portion on which the work was not done, and brings this case directly within the principle expressed in Merced Oil Min. Co. v. Patterson, 162 Cal. 358, 122 P. 950. Even if the agreement to keep up the assessment work had not been made,

the case would not be governed by the principles announced by the Supreme Court of California in its first hearing of Merced Oil Min. Co. v. Patterson, 153 Cal. 624, 96 P. 90, for the title to both divided halves had merged in Jesse Noble prior to his deeding an undivided half of the lower half of No. 6 to defendant Thompson, and as to that lower half Jesse Noble was a tenant in common with defendant Thompson and certainly had the right to do assessment work on the upper half for the benefit of himself and his cotenant of the lower half. Therefore I hold that whatever assessment work legally applicable to No. 6 above was done by Jesse Noble on the upper divided half of the claim inured to the benefit of the lower half. No default is claimed as to assessment work prior to 1928. The proof shows that during each of the years 1928 and 1929 assessment work of the value of at least $100 was done by Jesse Noble on the upper half of No. 6 and recorded by him for the benefit of No. 6. During each of the assessment years 1930 and 1931, work to the value of more than $300, and probably of several hundred dollars, was done by Johnson and King on creek claims 7 and 8 above, Cleary creek, in cleaning out a ditch, repairing flumes along the ditch line, and putting the ditch in shape to carry water to a point within a comparatively short distance from the lower end of No. 7, from which point the water was carried by pipe line to Discovery, Chatham, and there used in connection with the dredging operations of Johnson & King. Defendant Jesse Noble owns 7 and 8 above upon which was located said ditch from its intake as far as it was cleaned out and according to the undisputed testimony he gave Johnson and King permission to take out the water on 8 above and prepare the ditch for service and use it with the intention that thereafter he would be able to use that water at the lower end of 6 in mining operations. Such was the testimony of defendant Noble and of either King or Johnson, and, in accordance with that understanding, they filed affidavits of assessment work having been done for the benefit of Nos. 6, 7, and 8. The water was carried by the ditch

to a point as high as the highest ground on 6, and could easily and advantageously be used in mining No. 6, and bringing that water to prepare to mine 6, along the line of an old ditch which had been dug years before, was the natural and economical way, as was done. There was no serious question raised as to the feasibility of so using that ditch, but it is urged that the water was in fact taken to Chatham and the primary purpose of digging the ditch was to facilitate mining on Discovery, Chatham creek. It is not necessary that the only purpose of assessment work shall be to benefit the claim for which it was done, nor is it essential to the validity of assessment work that is potentially capable of use for a claim that it actually be so used, provided the work was done in good faith with the idea that it would at some time be so used and provided further that it was actually of benefit to the claim for which it was done. There can be no doubt that the work done in taking water across 7 and 8 to a point where it could easily and with very little additional expense be used in mining No. 6 added to the value of 6 at least as much as the cost of the work done on the ditch. Based on the work on the ditch, affidavits of assessment work on 6 above were filed in 1930 and 1931, and in these affidavits, which were made under the direction of the defendant Noble and at least one of which was sworn to by him, he described No. 6 above and Nos. 7 and 8 above as contiguous claims, and says he grouped them for assessment work. Plaintiff now claims that this admitted work was not applicable to 6 above because it was not contiguous with No. 7 and because there was not a "common ownership" in 8, 7, and 6. She contends that only claims that are commonly owned and such as are contiguous can be grouped, and cites in support of her position several cases containing general statements which tend, apart from the facts in connection with which they were made, to sustain her position.

It is claimed by plaintiff that No. 6 above is not contiguous with No. 7, in that only the southwest corner

of 6 touches the northern boundary of 7. These claims were first located thirty-one years ago; 6 being staked before 7. To prove the original boundaries of 6 and to show that such original southern boundary of 6 was not contiguous with what is admittedly the northern boundary of 7, plaintiff put on the stand Al Hilty, who testified that he was with the stakers of 6 when it was originally staked for Mr. Howes, who is the source from whom, through mesne conveyances, defendant Thompson derives her title. Mr. Hilty claims that he helped to stake No. 6, but his testimony was so indefinite and vague it was evident he had little, if any, actual remembrance as to the marking of the boundaries, and his testimony attempting to fix the situs of the southeast corner of 6 (the southwest corner being admittedly on the 7 line) carried no conviction to my mind. Jesse Noble, who staked 7, was also called upon by the plaintiff and testified that he had always known there was a "fraction" between 6 and 7. He also testified that that fraction had never been located until Mrs. Rickert included it in her 1931 location of 6. Hilty, Noble, and one or two other persons testified that there was an old post at or near the southern end of the Cunningham Fraction, and the suggestion was that such post was a stake of 6. Admitting the presence of that old post or stake, there is no proof that it was a corner stake of 6. No witness identified it as such by any markings thereon. There is equal proof that there was and still is an old stake at the northeast corner of 7, and Jesse Noble alone says that that old stake is an original stake of 7. I place no confidence at all in Jesse Noble's statements as to the original boundaries of 6 and 7. It is a matter of judicial knowledge as well as testified to by Captain Cunningham, a defense witness who for years has owned claims adjacent to 6 and 7, that in 1903 and for a long time thereafter people were "running up and down the creek to find fractions." It is also in evidence and the court takes judicial knowledge of the fact that from 1903 for several years Cleary creek and Chatham creek were considered very valuable, and that

Cleary creek produced a great deal of gold, and that Chatham creek was, at least for some distance up, a rich creek, and that any fraction on Cleary creek and close to the mouth of Chatham was valuable and desirable. Jesse Noble's testimony that there was a considerable space of ground adjoining and between two claims of his on Cleary (6 and 7) and that the witness knew of that vacant ground lying between Cleary creek and Chatham close to their confluence, and that such ground was open to location and not located for twenty-nine years after the first locations about it, and that he knew of it all those years, is as unbelievable as that Mr. Noble would have let a cache of $20 gold pieces belonging to no one and his for the taking lie untouched. These boundaries over thirty years old are ancient boundaries. The Modern Law of Evidence, Chamberlayne, 2804a. Cf. also Lord's Oregon Laws, § 727, par. 11, which is simply a codification of the law of evidence; also, Words and Phrases, First, Second, Third & Fourth Series, defining Ancient Deed, Ancient Documents. Reputation and hearsay are admissible to prove ancient private boundaries. 9 C.J. 274, § 310, and cases cited; Shutte v. Thompson, 15 Wall.(82 U.S.) 151, 21 L.Ed. 123; Taylor & Crate v. Forester, 148 Ky. 201, 146 S.W. 428. Therefore testimony of owners of adjacent property and occupants of the property in dispute as to the location of the boundaries of that property is admissible.

Such testimony was admitted, and, while it was mostly negative in form, no person except Jesse Noble testified that he had ever heard of any fraction or vacant ground between 6 and 7, and there is no escape from the conclusion that dating from the time the original boundaries were freshly and plainly marked on the ground the southern boundary of 6 has been considered and established as coincident with the northern boundary of 7 and was so recognized by those who were familiar with the stakes and other boundary markings. Contradicting Jesse Noble's statement that there was such vacant ground, we have his affidavits of assessment work for two successive years in

which he describes claims 6, 7, and 8 as contiguous. Plaintiff's attorney suggests that in making such affidavits Jesse Noble did not understand the true meaning of the word "contiguous" and believed that, because the southwest corner of 6 was on the line of 7, contiguity existed. On the witness stand Jesse Noble did not offer any such explanation, though his attention was called to his affidavits alleging contiguity. It is also to be noted that Mr. Noble says he consulted a lawyer with reference to the validity of his assessment work, and it does not appear that he advised that lawyer as to the lack of contiguity. Furthermore, there is testimony as to negotiations by Noble for the sale of 6, 7, and 8, and no mention was made of any vacant ground between 6 and 7. It appears, if the testimony of plaintiff and Noble is to be believed, that soon after Mr. Noble visited his lawyer and was by him advised that Noble's assessment work was of no avail for No. 6, because Mrs. Thompson had an interest in 6 and therefore Noble could not group it with 7 and 8, by mere coincidence and without consultation with Mr. Noble, plaintiff, Mr. Noble's closest neighbor for years and admittedly his housekeeper at times, also went to a lawyer who had theretofore been Noble's legal adviser for advice as to assessment work on these claims and received the same advice that had been given Noble, with the additional instruction that she should relocate No. 6. Plaintiff and Jesse Noble lived on Dome creek two miles and over a mountain from No. 6, but shortly after visiting the lawyer she went to Cleary creek and there staked number 6, making her southern boundary thereof coincident with the northern boundary of 7, just as I am constrained to believe 6 was originally staked and located. Plaintiff's pleadings in no place indicate any discrepancy between the boundaries she claimed and those of the original No. 6.

I find that the southern boundary of 6 as originally located was coincident throughout its length with the northern boundary of 7, which, however, extends beyond the boundary of 6 in a westerly direction. This finding con-

forms more nearly to the calls of the original location notice than the boundaries asserted by Noble.

Even if, as claimed by plaintiff, there were vacant ground belonging to the United States between 6 and 7, it does not necessarily follow that work beneficial in fact to No. 6 and done for the benefit of No. 6 could not be done on 7 and 8 under the provision for grouping. The effect of grouping is to relax to some extent the tests by which assessment work may be held to apply. The statute permitting expenditure upon one of a group of gold placer or quartz claims (title 30 U.S.C.A. § 28, section 136, Compiled Laws of Alaska) for the benefit of the group provides that such claims must be held in common, but says nothing as to contiguity. It is significant that by statute (title 30 U.S.C.A. § 102, section 183, C.L.A.) contiguity is made a condition of grouping for assessment work oil land claims located as placers.

Among the apparent reasons for the judge-made requirement that only contiguous gold placer or quartz claims may be grouped is that, in cases of tunnels, shafts, and perhaps, in some instances, ditches constructed upon one or more claims for the benefit of those claims and some third noncontiguous claim, the owner of intervening ground, by refusing to allow right of way across such ground, might prevent access to such shaft or the completion of tunnel or ditch, thereby practically preventing such work from benefiting the noncontiguous claim, but, in the case of ditches where the intervening ground is public land of the government of the United States which by statute (title 30 U.S.C.A. § 51, section 151, C.L.A., and title 43 U.S.C.A. § 956) has recognized rights of way for ditches for mining or other beneficial use across such unappropriated ground, and in jurisdictions such as Alaska, where by the exercise of the rights of eminent domain a right of way may be condemned across public ground for mining ditches (Van Dyke v. Midnight Sun Mining & Ditch Co. [C.C.A.] 177 F 85), there is no way to prevent the use of such ditch for

the benefit of the noncontiguous claim and the reason for the rule fails, and therefore the rule itself fails.

Chambers v. Harrington, 111 U.S. 350, 4 S.Ct. 428, 430, 28 L.Ed. 452, is probably cited more than any other case as authority for requiring contiguity. In that case, after discussing at length the reasons for requiring assessment work and for allowing grouping the court, speaking of conditions allowing grouping, says: "It is equally clear that in such case the claims must be contiguous, so that each claim thus associated may, in some way, be benefited by the work done on one of them." In that case the development work claimed as group work was performed by sinking a shaft on a quartz mine, which, as pointed out above, could be prohibited from being of benefit to a noncontiguous claim provided an intervening private owner refused a right of way through his claim. Furthermore, the claims grouped in the Chambers Case were contiguous; therefore the question of contiguity was not there in issue, and the Supreme Court was there considering the applicability of work on a shaft, and their general statement was made with that in mind and should not be considered with reference to the application of work on a ditch. At best its general statement quoted above was dictum. Hain v. Mattes, 34 Colo. 345, 83 P. 127. In Big Three Mining & Mill. Co. v. Hamilton, 157 Cal. 130, 107 P. 301, 305, 137 Am.St.Rep. 118, the Supreme Court of California said: "Undoubtedly, the better authority supports the contention that assessment work may be done upon one of a group of claims owned in common, even though the claims are not all adjoining"—citing Snyder on Mines, p. 444; Altoona Q. M. Co. v. Integral Q. M. Co., 114 Cal. 100, 45 P. 1047. In the Big Three Mining & Milling Co. Case, as well as In Chambers v. Harrington, the claims involved were adjoining, and the statement of the court was dictum, but the case is well reasoned and invites careful reading. In Lindley on Mines (3d Ed.) § 631, p. 1558, that eminent authority, speaking of group assessment work, says:

"Underneath public land not claimed by anyone he (the claimant) could undoubtedly prosecute such work and acquire an easement at least when the work was completed, and in States where mining is a public use, condemnation proceedings would enable him to secure his right of way and thus render it possible for him to prosecute work outside of his claims and entitle it to be credited. In other States, where condemnation for mining purposes is not recognized and the surface of intervening ground privately owned by others, in the absence of an agreement permitting such work to be continued underneath such intervening ground, there is a valid reason for not crediting it to the claims thus separated from it.

"The rule is well settled that work done outside of a claim or group of claims, if done for the purpose and as a means of prospecting or developing the claim, as in the case of tunnels, drifts, etc., is as available for holding the claim or claims as if done within the boundaries. One general system may be formed, well adapted and entered into, to work several contiguous claims or lodes, and, when such is the case, work in furtherance of the system whether done within or without the claim or claims is work on the claims intended to be developed."

This statement of Mr. Lindley recognized the principles which it seems to me apply in this case.

Whether noncontiguous claims may be grouped depends upon the circumstances of each case, the nature of the work, the character of the ground grouped, the plan for common development, the ownership of the intervening ground, the existence of an arrangement for right of way across such ground; the true tests being, Can the work be made applicable to all the ground, and does it tend to the development of the group, and was it made in good faith for that purpose?

Even if I did not find that 6 and 7 were contiguous, I would still hold that the work which was done on the ditch

running through 8 and 7 would be applicable to 6 and that the three claims could be a group for assessment work.

 It is contended in this case that, since Mrs. Thompson was not a co-owner with Jesse Noble in the upper half of 6 and in 7 and 8, he could not group 6, 7, and 8 for assessment work. The statute providing for grouping does not say that the claims to be grouped must be owned by tenants in common. It says that the claims must be held in common, which I take it means simply that there must be a common right in the person doing the assessment work to do such work on each and every claim in the group and incidentally to determine how that work shall be done. No case has been pointed out to me where this statute was construed to mean that a single person holding two or more claims could not group them for the purposes of assessment work, nor do I see any reason why such a decision should be rendered. Every consideration which could have moved Congress to allow grouping by several who were tenants in common in a group of claims would be equally applicable to a single individual owning a group of claims. As a co-owner, Jesse Noble had the right independent of his agreement with Nellie Thompson binding him to keep up the assessment work, and especially under that agreement, to do assessment work for the benefit of No. 6 and to choose where and how it should be done. I cannot conceive that he lost that right merely because her cotenancy only extended to the lower half of No. 6. Furthermore, it is not necessary that 6 should be one of a group in order that work done outside of its boundaries should be applicable as assessment work for that claim. Assessment work may be done for the benefit of a claim either on other claims or upon public land, provided it is actually done for the benefit of such claim and such work is in fact beneficial to the claim. Section 631, Lindley on Mines, quoted above. When work done outside the boundaries of 6 was claimed as assessment work applying to 6, the burden was upon the owner of 6 to show that he intended such work to benefit

6 and that in fact it did benefit 6, and, if he has borne that burden successfully, it is immaterial that he thought he had grouped 6 with other claims and it is immaterial that he filed an affidavit of assessment work claiming a grouping. That affidavit was simply to furnish prima facie proof that he had done the work. Had he neglected to file such an affidavit, he would still be entitled to prove that he had done the work, and, if he made such proof, could hold his claim. In this case Jesse Noble himself has testified that he intended to use on the lower end of 6 the water which he brought to the lower end of 7. There is other testimony to the same effect, and there is no doubt that the water could be so used. Of all methods of mining a placer mining claim which is known to contain gold, probably the most effective is to bring water to such a point on or above the claim that such water can be used in mining the claim, and, when the water is so brought for that purpose, it is not necessary that the water should actually thereafter be so used in order that the work inure to the benefit of the claim.

Even if 7 and 6 are not contiguous and even if Jesse Noble was prohibited from grouping 6 with 7 and 8, I should still hold that the bringing of the water to such a point upon 7 that it could be readily used on 6, in connection with the testimony given that it was intended to be used on 6, would constitute good assessment work for 6.

I am satisfied from the testimony in this case that during the labor years 1930 and 1931 Jesse Noble in good faith for a valuable consideration caused water to be brought to where it could be used on 6 with the intention thereby to develop 6 and ultimately 7 and 8, and that the work done in bringing that water was applicable to and inured to the benefit of the lower half of 6 as well as the upper half; hence that 6 was not at the time of plaintiff's relocation vacant unappropriated public land and that plaintiff's attempted relocation was void.

It is to be borne in mind that plaintiff's asserted rights to No. 6 are based upon forfeiture of a prior location, and forfeitures are not favored in the law, and further that it is the policy of the government to encourage the development of mining property, and the mining laws are to be liberally construed for the benefit of a bona fide locater.

During the argument at the close of this trial, defendant Thompson suggested that in making her location plaintiff had not conformed to the law in various particulars. The case was tried entirely upon the theory that, if the ground located was open for location on October 19, 1931, plaintiff's location was valid. I find that plaintiff did substantially comply with the acts of location required by law, but that the ground covered by plaintiff's location was not open for relocation.

It is also urged by defendant Thompson that I should find that her cotenant Jesse Noble and the plaintiff conspired to defraud defendant Thompson of her interest in No. 6 and that plaintiff does not come into a court of equity with clean hands. In the face of the testimony of plaintiff and Jesse Noble to the contrary, I am very strongly of the opinion that prior to plaintiff's attempted location of 6 they had an understanding about that location and that plaintiff made her attempted location at the instance of Noble and with some understanding that he should share in the ground after location. The terms of that understanding are not before me, and my belief that it existed is wholly based on circumstantial evidence that does not tend to reveal the exact or proximate terms of that understanding. There is nothing in the evidence in any way tending to show that Jesse Noble fraudulently or at all failed to keep up his assessment work, and I am not prepared to make a finding that in 1931, prior to plaintiff's location, he did not in good faith believe that under the law his assessment work did not inure to the benefit of 6, nor to find that the plaintiff, who owed no obligation to defendant Nellie Thompson, had anything whatever to do with any alleged defects in the

performance of the assessment work. I am satisfied that plaintiff and Jesse Noble welcomed any construction of the law which would deprive Nellie Thompson of her interest in No. 6, and my opinion of some of the testimony given by Jesse Noble has already been indicated, but I do not find that plaintiff has come into court with unclean hands.

Findings and judgment may be drawn in accordance with this opinion.