353 F.2d 804
 Sam MACRI, Don Macri and Sam Macri, Jr., a partnership d/b/a Macri Construction Company, and Continental Casualty Company, a corporation, Appellants,
v.
The UNITED STATES of America, for the Use of JOHN H. MAXWELL & COMPANY, Inc., Appellees.
 No. 19049.
 United States Court of Appeals Ninth Circuit.
 December 2, 1965.
 
 COPYRIGHT MATERIAL OMITTED John E. Manders, Anchorage, Alaska, Lyle L. Iversen, Lycette, Diamond & Sylvester, Seattle, Wash., for appellants.
 Donald McL. Davidson, Ferguson & Burdell, Seattle, Wash., Theodore M. Pease, Jr., Burr, Boney & Pease, Anchorage, Alaska, for appellees, cross-appellants.
 Before POPE, KOELSCH and BROWNING, Circuit Judges.
 KOELSCH, Circuit Judge.
 
 
 1
 This is a suit under the Miller Act, 49 Stat. 793, 40 U.S.C.A. §§ 270a-270e. It includes claims by John H. Maxwell & Company, Inc. (Maxwell), a subcontractor, against the general contractor, Macri Construction Company, a partnership (Macri) and the latter's surety, Continental Casualty Company, and Macri's counter-claims against Maxwell and Maxwell's surety, General Insurance Company.
 
 
 2
 The controversy arose out of Maxwell's performance of a subcontract with Macri to erect three large fuel tanks at King Salmon Airport, Alaska. By its suit, Maxwell sought to recover the unpaid balance of the contract price plus compensation for extra work; Macri in turn sought damages for delay in performing the contract and for poor workmanship.
 
 
 3
 Following a protracted trial, the district court held the claims of both parties essentially valid. It found that Maxwell had substantially performed the contract and had also done certain extra work; that completion was 53 days late, but that 14 of those days were chargeable to Macri for failure to provide proper foundations on which to erect the tanks; that this delay forced Macri to suspend further work of its own; and that some of Maxwell's welding was defective.
 
 
 4
 The court had Macri's accounts audited by a special master before fixing the amount of either litigant's liability. A set-off of one amount against the other resulted in a net balance of $68,972.37, in favor of Maxwell. In addition, the court allowed Maxwell interest amounting to $17,266.28, but denied attorney's fees. Judgment was entered accordingly. All parties, except General Insurance Company, have appealed. We affirm.
 
 
 5
 Macri does not contend that it is not liable for the unpaid balance of the contract price reflected in the judgment, nor does it attack the court's findings that the foundations were faulty and that Maxwell performed extra work. But it vigorously argues that Maxwell was not entitled to assert any claim for extras or to a credit against the delay.
 
 
 6
 The prime contract contained several provisions, like those appearing in most building contracts, relieving the owner of liability unless the general contractor notified the owner in writing within a specified time of conditions that would delay performance and of additional compensation that would be claimed for extra work or changes required by the owner. The subcontract made such provisions applicable between the general and subcontractor.
 
 
 7
 Notice provisions of this type are for the protection of the party for whom the work is done. Thus in Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342 (1913) the Court, in affirming a judgment denying the contractor's claim for delay due to a defect for which the owner was responsible, pointed out that if the requisite notice had been given, the owner might have eliminated the trouble and prevented the delay; and in Anthony P. Miller, Inc. v. United States, 77 F.Supp. 209, 111 Ct.Cl. 252 (1948) the Court of Claims, in an opinion by Judge Madden, held that as to extra work prior notice insured the owner against unexpected claims being made after the work was done.
 
 
 8
 However, compliance with them may be waived [Continental Casualty Co. v. Schaefer, 173 F.2d 5 (9th Cir. 1949); see Shutte v. Thompson, 15 Wall. 151, 82 U.S. 151, 21 L.Ed. 123 (1872)], and the evidence provides ample support for the conclusion of the district court that in this case there was a waiver. Under the terms of the contract between the parties, Macri was to provide the foundations upon which Maxwell was to erect the tanks. Both the extra work and the part of the delay for which the lower court allowed Maxwell a credit were caused by unevenness of the foundations and other defects in them. Maxwell first complained on commencing the job and advised Macri that these conditions would slow down the erection of the tanks and require extras at added cost. Macri did attempt to remedy the trouble but, although unable to do so, ordered Maxwell to proceed. Under these circumstances, equity does not permit Macri to assert surprise and prejudice.
 
 
 9
 Macri's next assignment concerns the court's allowance of interest by way of damages for failure to pay the balance owing on the subcontract. The objection is not that the court allowed Maxwell any interest, although time was when the courts held that where a bona fide counterclaim was asserted in a suit brought to recover a liquidated amount owing on a contract, such an allowance was not permitted. Excelsior Terra Cotta Co. v. Harde, 181 N.Y. 11, 73 N.E. 494 (1905), affirming 9C App.Div. 4, 85 N.Y.S. 732 (1904); Hansen v. Covell (1933) 218 Cal. 622, 24 P.2d 772, 89 A.L.R. 670. See also, cases appearing 3 A.L.R. at 814. Rather, Macri argues that the amount of the interest that was allowed was excessive because, before making the assesment, the court did not reduce the unpaid contract balance, a liquidated sum, by the amount awarded Macri on its counterclaim but instead considered the entire balance and, as a result, mulcted Macri for withholding moneys that were not in fact owing.
 
 
 10
 While Maxwell's claim for the balance due on the contract was liquidated, the counterclaim constituted an unliquidated claim, and ordinarily a debtor may not defeat the creditor's right to interest on a liquidated sum by setting up such a counterclaim as an offset. Hunt Foods, Inc. v. Phillips, 248 F.2d 23 (9th Cir. 1957); Soby v. Johnson, 270 F.2d 193 (9th Cir. 1959); Hansen v. Covell, supra. However, as Macri notes, this general rule is not without exceptions. Thus, some courts declare that in instances where the counterclaim is for defective performance of the contract on which the liquidated claim is based, the damages assessed under the counterclaim are regarded as payment pro tanto and interest should be awarded only on the remainder. Hansen v. Covell, supra; Mall Tool Co. v. Far West Equipment Co., 45 Wash.2d 158, 273 P.2d 652 (1954).
 
 
 11
 However, conceding the validity of the qualified rule, its application is not warranted here, for Macri also was held liable to Maxwell on an unliquidated claim and in an amount exceeding that assessed against Maxwell. Considerations of fairness would hardly be met if the treatment accorded one counterclaim differed from that given the other. Both of them were essentially of the same character. This court has only recently approved as equitable an offset of one such claim against another in a case identical to the one presently under consideration [Sam Macri & Sons, Inc. v. United States of America, for Use of Oaks Const. Co., 313 F.2d 119 (9th Cir. 1963)] and, after a thorough re-examination, our confidence in the correctness of that decision remains unshaken.
 
 
 12
 Macri lastly urges "that the court erred in requiring audit, at defendant's expense, only of defendant's evidence, by special master." But Macri made no objection in the district court to the reference and hence is confronted here by the well settled rule that a court of appeals does not ordinarily consider alleged errors of the district court that are complained of for the first time on appeal.
 
 
 13
 We are told, however, that Macri never had an opportunity to object "until the decision was made," and that therefore we manifestly ought to consider the assignment, since Rule 46 provides that "if a party has no opportunity to object to a ruling or order at the time it is made, the absence of objection does not thereafter prejudice him." While it is true that the "decision" was made following submission of the cause, the court made no appointment until several months after the decision was announced. In the interim, Macri had ample opportunity to object. Thus, in the initial memorandum opinion, the court stated that the services of an expert accountant were necessary for a proper appraisal of Macri's accounts and records, and the expense would be charged to Macri. To that end the court declared that the parties themselves should select the person to be appointed. The clerk's docket entries, which constitute the only record of the matter brought up on this appeal, indicate that the parties were unable to agree and that the appointment was made following a hearing, with notice to the parties.
 
 
 14
 Nor is a reference the type of matter that an appellate court ordinarily considers on its own motion under the plain error rule. There can be no doubt — indeed Rule 53 in terms recognizes — that a trial court possesses the power to enter such an order; thus our only inquiry would center solely upon the question of discretion and, in a case involving several hundred exhibits containing accounts, an abuse of discretion would rarely be found.
 
 
 15
 We come now to Maxwell's cross-appeal but, before discussing the several points, make the following brief factual statement which will be helpful to their understanding.
 
 
 16
 The tanks were constructed by welding together sheets of steel which had been pre-fabricated elsewhere by third persons and shipped to the job site. The subcontract required Maxwell to erect the tanks in conformity with the plans and according to the specifications appearing therein and in the main contract between Macri and the United States. These contracts required that there be "100% penetration" of the weld into and along all seams wherever the sheets were joined to form the body of the tanks.
 
 
 17
 In early October, shortly after Maxwell completed its work, tests were made for leakage, and the government inspector issued his certificate that the tanks were watertight. Maxwell then removed all of its equipment from the job and Macri resumed some work of its own. However, the winter weather soon caused a shut down and it was not until the following April that Macri was able to finish. At that time the inspector, upon further examination of the tanks, including the taking of core samples of the welded joints, discovered the welds of the floor plates which rested upon the concrete bases extended only part way into the joints and failed to penetrate to the bottom. Since this welding did not meet the specified "100% penetration" he directed Macri to make a correction. It was agreed that this would be done by welding metal strips on top of faulty joints. Then (according to the court's written memorandum opinion which, together with a supplemental opinion, constituted the findings of fact and conclusions of law in the case) "Macri notified Maxwell of this requirement but Maxwell advised that they could not do the work for lack of financing unless paid for it in advance or paid $15,000 on the balance due on the [sub]contract, asserting that the work should constitute an extra with the prime contract, and refusing to accept responsibility for the work. Macri advised that they would do the work and hold Maxwell responsible, and then employed another contractor to do the work."
 
 
 18
 Maxwell does not dispute the fact that the welding was defective or that the cost of correcting the defects was reasonable, but it nevertheless contends that it was not liable.
 
 
 19
 Maxwell points out that its construction was in accordance with the plans which showed the floor plates resting directly upon the concrete foundations and calls attention to the testimony of several witnesses to the effect that, under such conditions, a full penetration of a weld into the joints is not possible and only may be achieved if a metal strip known as a "back up" bar is interposed between the joint and the concrete. Maxwell also notes that the work was subject to continual inspection, and in fact the tanks were tested and certified watertight by the inspector upon completion of the welding. Maxwell then argues that the defects were inherent in the plans themselves and, in addition, that the government was at fault in not testing the welds and bringing the matter to Macri's attention while Maxwell was present and easily able to make any corrections.
 
 
 20
 There was considerable expert evidence that the design was not sound, but there was also similar evidence that a competent contractor could have met the requirement under the existing specifications. The issue was essentially factual and we cannot say that the trial court's resolution was clearly erroneous.
 
 
 21
 The trial court, although highly critical of the government for waiting so long to examine the welding, saw "no alternative but to allow the claim — (for work) for which the subcontractor is legally responsible." This conclusion was clearly correct. The main contract which was binding upon Maxwell expressly entitled the government "* * * at any time before final acceptance of the entire work to make an examination of work already completed by removing or tearing out same * * *" and further provided that if found defective the contractor was chargeable with expense of proper reconstruction. The government acted well within its rights and, so far as the evidence shows, without any ulterior motive. The trial court found that the earlier certification of water tightness was not a complete approval of the tanks and that they were not finally accepted until August 1, 1958, when the government made its final inspection.
 
 
 22
 The cases of Johnson & Sons v. United States, to Use of Baltimore Brick Co., 153 F.2d 534 (4th Cir. 1946) and White Engineering Corporation v. United States, for Use of Pittsburg Plate Glass Co., 311 F.2d 410 (10th Cir. 1962) do not aid Maxwell. All Johnson holds is that an owner must select and test samples of materials that the subcontractor proposes to use in the manner and within the time specified by the contract and that a failure to do so constitutes a waiver of the right to hold the subcontractor liable if the work is faulty due to the quality of the materials. We read White as saying simply that the evidence sustained the finding that the subcontractor had properly cleaned the windows as required by the contract and as parenthetically noting that one of the government inspectors had so testified; there was no issue in that case regarding the effect of a failure by the owner or prime contractor to inspect the work.
 
 
 23
 Nor did the district court err in not excusing Maxwell from liability for the expense of correcting the defects because of Macri's refusal to accede to Maxwell's terms. As appears from the earlier quotation from the court's findings:
 
 
 24
 "* * * Maxwell advised that they could not do the work for lack of financing unless paid for it in advance or paid $15,000 on the balance due on the contract, asserting that the work should constitute an extra with the prime contract, and refusing to accept responsibility for the work."
 
 
 25
 We are fully aware that at the time Macri was withholding payments provided in the subcontract in a sum considerably larger than that demanded. And it is well settled that an owner's failure to make progress payments on a building contract may constitute a material breach, justifying the builder's refusal to proceed with the work on the theory that the owner has rendered his performance impossible. Guerini Stone Co. v. P. J. Carlin Construction Co., 248 U.S. 334, 39 S.Ct. 102, 63 L.Ed. 275 (1919). However, that rule has no application here for Maxwell conditioned its performance upon additional compensation. As the court found, Maxwell denied its clear obligation to correct poor workmanship and insisted that the rewelding would only be done if paid for as an extra.
 
 
 26
 Maxwell further urges that it should not have been held liable for the cost of the correction because the addition of the strips on top of the defective seams was in fact an extra for which the government would have paid if Macri had made a proper claim. Granting that the general contractor alone has standing to assert such a claim against the government, we do not think that the evidence here would require the trial court to fault Macri. On several other occasions, whenever a question had arisen concerning work as an extra, Macri had willingly permitted Maxwell to use its name in making claims and in appearances before the representatives of the Corps of Engineers. But on this occasion Maxwell made no such request.
 
 
 27
 We are not persuaded that the trial court should have allowed Maxwell attorney's fees. The law of Alaska, applicable to suits under the Miller Act, makes provision for such an allowance to the prevailing party [Rule 82, Alaska Rules of Civil Procedure]; but whether or not an allowance should be made is a matter for the trial court to decide in the exercise of sound discretion. Davidsen v. Kirkland, 362 P.2d 1068 (Alaska, 1961). It is true that Maxwell recovered a larger percentage of its claim and a larger monetary sum than Macri, but these facts alone in a case as involved as this one do not in our estimation necessarily establish that the experienced trial court was acting capriciously in ruling against Maxwell.
 
 The judgment is affirmed.[1]
 
 
 Notes:
 
 
 [1]
 There was one additional assignment that is not discussed. Maxwell stated in brief and reiterated on oral argument that it did not urge the point if the portion of the judgment attacked by Macri was affirmed