**Eric SOBY, d/b/a Soby Painting Co., and United States Fidelity and Guaranty Company, Appellants,**

v.

**Lloyd W. JOHNSON and Max J. Kuney, d/b/a Kuney Johnson Company, Appellees.**

**No. 15823.**

United States Court of Appeals Ninth Circuit.

Sept. 8, 1959.

**194**

Harry C. Wilson, Bellevue, Wash., Harold J. Butcher, Manders, Butcher, Dunn & Connolly, Anchorage, Alaska,

Edgar Paul Boyko, Los Angeles, Cal., for appellant.

Olwell & Boyle, Lee Olwell, Rummens, Griffin, Short & Cressman, Paul R. Cressman, Seattle, Wash., Paul F. Robison, Anchorage, Alaska, for appellees.

Before STEPHENS, BAZELON and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

In October and November, 1952, appellees entered into construction contracts with the United States whereby appellees contracted to build certain buildings for the United States military. The contracts were for buildings at two locations, one at Ladd Air Force Base and the other at Eielson Air Force Base, both in Alaska. Appellees, as prime contractors, subcontracted with appellant Soby whereby Soby undertook to do the painting and other work incidental to painting on both projects. Appellant United States Fidelity and Guaranty Company (herein called Surety) was surety for Soby under both contracts.

Soby brought an action against appellees in the Third Division of the District Court for the Territory of Alaska under the so-called Miller Act, 40 U.S.C.A. § 270a et seq., seeking recovery for his work on the projects upon a theory of *quantum meruit*. He alleged appellees had used faulty material on the Ladd project, which made his work more difficult and costly and obliged him to repaint units already completed, whereby he was damaged. Appellees cross-complained, seeking damages for alleged breaches of contract by Soby on both the Ladd and Eielson projects.

Appellant Soby's action was dismissed, and judgment was granted appellees on both their cross-complaints. Except for an incidental matter, appellants appeal only with respect to the cross-complaint respecting the Eielson project, for which appellees received judgment of $53,955.43.

The facts giving rise to the dispute are these. Soby commenced performance under his two subcontracts in the spring

of 1953, but for reasons not relevant here, abandoned work on both jobs at the direction of Surety on December 19, 1953. Four days later a representative of Surety wrote a letter to appellees in which he said:

"* * * this leaves you free and without prejudice to complete the contracts and to tender to us the claim of the cost of the completion over and above the contract prices involved."

Accordingly, with the express approval of Surety, Larsen (or Larson) Brothers Painting Company was engaged to complete the painting under the subcontracts. Under this arrangement, Larsen was to be compensated for actual costs, plus 10% of the labor only. The percentage was not computed on the cost of materials, and no overhead or profit (other than 10% on labor) was charged.

In connection with the Eielson painting subcontract, appellees spent or incurred obligations totalling $132,292.33, and earned $78,336.90. Appellees were awarded the difference, $53,995.43, which sum the trial court found reasonable. Appellants claim this award was excessive.

Other than intimations of "outrageous padding, feather-bedding and profiteering," and of "collusion of the general contractor and his hand-picked substitute subcontractor," for which we find no support in the record, appellants' claim of error is based solely on a "percentage of completion estimate" filed by appellees with the Contracting Officer for the United States. This estimate was made after Soby's termination but before Larsen commenced work, and was filed for the purpose of securing payment, prior to completion, for work performed. Appellees were paid on the basis of the estimate, which showed the project 97.85% complete. A progress estimate discloses the "Interior Finish" (which included painting) was 91.18% complete. The gist of appellants' argument is that an award of almost $54,000 to complete 8.82% of a $78,000 job is excessive and unwarranted. Though the point has a surface plausibility, we think the trial court's finding of reasonableness of the award, far from being "clearly erroneous," is supported by substantial and convincing evidence.

First, one of the appellees testified without contradiction that it is understood in the business that percentage of completion estimates, though they may serve as a general guide, do not necessarily fairly reflect what portion of the work has actually been done, and in fact, less than 97.85% of the work had been completed at the time the estimate was prepared.

Secondly, the "Interior Finish" item, which was listed as 91.18% complete, included considerable work other than painting. The prime contract allotted $346,402.46 to Interior Finish, and the painting subcontract, included therein, accounted for only $78,336.90. Even if we assume that 91.18% of the $346,402.-46 Interior Finish work was complete, there remained over $30,000 of Interior Finish work to be completed, and, as appellants concede, the remainder of the work was "substantially all painting." This figure bears a close relation to that portion of appellees' total judgment attributable to the Larsen payroll, which, including taxes and 10% fee, was $33,-251.06. This sum was amply supported by payroll records, invoices, government inspectors' reports and other evidence. In addition, weekly invoices were sent to both appellants as expenditures were made, and the record indicates appellants had other knowledge of the progress of the work. Officials of both Larsen and appellees testified all expenditures were reasonable and the trial court so found.

In United States v. Behan, 1884, 110 U.S. 338, 4 S.Ct. 81, 83, 28 L.Ed. 168, the Supreme Court said:

"Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures. So far as appears, they were incurred

in the fair endeavor to perform the contract which he assumed. If they were foolishly or unreasonably incurred, the [appellant] should have proven this fact. It will not be presumed. \* \* \*

"The *prima facie* measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. \* \* \* It does not lie, however, in the mouth of the party, who has voluntarily and wrongfully put an end to the contract, to say that the party injured has not been damaged at least to the amount of what he has been induced fairly and in good faith to lay out and expend, (including his own services) after making allowance for the value of materials on hand; at least it does not lie in the mouth of the party in fault to say this, unless he can show that the expenses of the party injured have been extravagant, and unnecessary for the purpose of carrying out the contract."

Appellants rely solely on the percentage of completion estimate and the progess estimate. They offered no evidence to rebut the documented proofs of expenditure submitted by appellees. American Can Co. v. Garnett, 9 Cir., 1922, 279 F. 722; Elias v. Wright, 2 Cir., 1921, 276 F. 908.

We hold there was substantial evidence to support the judgment of the District Court on this issue.

When Soby abandoned the projects, he left various materials, equipment and supplies on the job sites. These were used by Larsen in completing the work. When the job was completed, the items were sold to another contractor. A set-off of $3,000 for these items was granted by the trial court. Appellants contend the allowance was arbitrary, but the trial court made his finding on conflicting evidence and it cannot be disturbed.

In addition to the weekly statements appellants received setting forth the cost of Larsen's work, interest claimed to be due on these amounts was billed to appellants on April 30, 1954, and August 31, 1956. These items of interest were included in appellants' principal recovery of nearly $54,000. Appellants make no objection to *these* items of interest, but *do* object to the trial court's allowance of interest on the amount of the judgment from and after September 1, 1956 (the day after the second interest billing), a date seven *months* prior to the judgment, rendered on April 11, 1957.

Appellants contend the amounts due appellees were unliquidated (and indeterminable until judgment) and that interest may be recovered only on liquidated demands, citing Stephens v. Phoenix Bridge Co., 2 Cir., 1905, 139 F. 248; Excelsior Terra Cotta Co. v. Harde, 1905, 181 N.Y. 11, 73 N.E. 494. We agree that appellants correctly state the general rule, Columbia Lumber Co. v. Agostino, 9 Cir., 1950, 184 F.2d 731, but do not agree appellees' claim was unliquidated. All work had been completed prior to September 1, 1956, and appellants well knew the amounts due. They were furnished periodic statements from which the amounts claimed to be due were readily ascertainable, and which the trial court found, to the penny, to be due in fact.

The Alaska statute governing the legal rate of interest,[1] which had its genesis in an earlier Oregon statute, was discussed in New York Alaska Gold Dredging Co. v. Walbridge, 9 Cir., 1930, 38 F.2d 199. The statute there in question provided in substance as it does now, and this Court refused to accept the construction of the Oregon Court that interest could not be allowed from a time prior to judgment. We hold that at least by September 1, 1956, the moneys had "become due," that they were certain and liqui-

---

1. Section 25–1–1 A.C.L.A.1949 provides:
  "The rate of interest in the Territory of Alaska shall be six per centum per annum, and no more, on all moneys after the same become due; on judgments and decrees for the payment of money \* \* \*."

dated, and that the award of interest was proper. See United States v. United States Fidelity & Guaranty Company, 1915, 236 U.S. 512, 35 S.Ct. 298, 59 L.Ed. 696.

Nor does the existence of an unliquidated setoff in favor of appellant Soby (the value of the equipment and materials left by Soby at the job site) affect the result. Hunt Foods, Inc. v. Phillips, 9 Cir., 1957, 248 F.2d 23.

■ Lastly, appellants, in their reply brief, for the first time contend the District Court did not have jurisdiction. No question is raised as to the jurisdiction of this Court. See Alaska Enabling Act, § 14, 48 U.S.C.A. preceding section 23; Parker v. McCarrey, 9 Cir., 1959, 268 F.2d 907.

All parties in their pleadings invoked jurisdiction predicated upon the Miller Act, 40 U.S.C.A. § 270a et seq. Appellant contends that under the Miller Act, actions must be brought in the "United States District Court,"[2] and that the Alaska Court in which the action was brought is not a "United States District Court."

It may be conceded that the Alaska Court is not and never has been a "United States District Court" for all purposes, but we are satisfied that it had jurisdiction in an action brought under the Miller Act. Nothing said in Parker v. McCarrey, supra, derogates from this conclusion. It is to be noted that 48 U.S.C.A. § 101 establishes a "district court for the District of Alaska, with the jurisdiction of district courts of the United States. * * *"

A contention similar to appellants' was raised with respect to the Taft-Hartley Act in International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corporation, 1951, 342 U.S. 237, 72 S.Ct. 235, 239, 96 L.Ed. 275. After noting the

Taft-Hartley Act lifted certain restrictive requirements which would otherwise preclude suit in district courts, such as the amount in controversy (a restrictive requirement abolished in the Miller Act), capacity to sue and be sued, and citizenship of the parties, the Supreme Court said:

"But since Congress lifted the restrictive requirements which might preclude suit in courts having the district courts' jurisdiction, we think it is more consonant with the uniform, national policy of the Act to hold that those restrictions were lifted as respects all courts upon which the jurisdiction of a district court has been conferred. That reading of the Act does not, to be sure, take the words 'district court of the United States' in their historic, technical sense. But literalness is no sure touchstone of legislative purpose. The purpose here is more closely approximated, we believe, by giving the historic phrase a looser, more liberal meaning in the special context of this legislation."

Appellants make the point that the reasoning of Juneau Spruce is not apposite here, as the lifting of the restrictive requirements respecting the "amount in controversy" has no possible application to the District Court for the Territory of Alaska, as that Court "was not and is not subject to such specific jurisdictional limitations" as amount in controversy. From this it is clear, the argument runs, that there was no intent to give the Alaska Court jurisdiction, as no such provision was necessary if it were intended to do so.

We are not impressed by this argument. We think the same considerations which commended themselves to the Supreme Court in Juneau Spruce are ap-

---

2. 40 U.S.C.A. § 270b in pertinent part provides:

"Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the *United States District Court* for any district in which the con-

tract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit, but no such suit shall be commenced after the expiration of one year after the date of final settlement of such contract. * * *" [Emphasis added.]

propriate here. The Miller Act deals with bonds which must be furnished by contractors in conjunction with contracts "exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States."

It would appear that a uniform, far-ranging policy was intended, and a technical construction which would limit application of the Act's remedial provisions is not warranted. In MacEvoy Co. v. United States, 1944, 322 U.S. 102, 64 S.Ct. 890, 893, 88 L.Ed. 1163, the Supreme Court noted a liberal construction had been given to the Heard Act, the predecessor to the Miller Act, that the Miller Act "is highly remedial in nature" and "entitled to a liberal construction and application." We conceive this policy to be applicable to the procedural as well as the substantive provisions of the Miller Act. Having regard for the special purpose of the legislation, a looser, more liberal interpretation is well justified.

Appellees have called to our attention that in 1939, Congress, in authorizing the Secretary of the Army to enter into cost-plus contracts within Alaska, further authorized him to waive the requirement of a performance and payment bond. 5 U.S.C.A. § 220. If there was a requirement for such bonds other than that contained in the Miller Act, appellants have not mentioned it and we have not found it. Unless the Miller Act was meant to apply to Alaska, the provision authorizing the Secretary of the Army to waive the requirement of a performance and payment bond would have been superfluous and without effect.

For the above reasons, we hold the Alaska Court had jurisdiction of the action under the Miller Act.[3]

3. The status of the Alaska Court with respect to the Tucker Act is discussed in United States v. King, D.C.Alaska, 1954, 119 F.Supp. 398.

4. "The measure and mode of compensation of attorneys should be left to the

In accordance with § 55–11–51 ACLA 1949,[4] codifying the provisions of the Act of June 6, 1900 (31 Stat. 321, Ch. 786), and Rule 25 of the Amended Uniform Rules of the District Court for the District of Alaska, appellees were granted $10,000 attorney fees in the judgment. Appellees have filed a motion for an additional allowance for services rendered by their attorneys on this appeal. Assuming, without so deciding, that we have power to grant such a motion, we decline to exercise it. The motion is denied.

*The judgment is affirmed.*

agreement, express or implied, of the parties; but there may be allowed to the prevailing party in the judgment certain sums by way of indemnity for his attorney fees in maintaining the action or defense thereto, which allowances are termed costs."