UNITED STATES of America for the Use and Benefit of CHEMETRON CORPO-RATION, a corporation, Denver Oxygen Company, a corporation, and Welders Supply Company, a corporation, Plaintiffs,

v.

GEORGE A. FULLER CO. and Del E. Webb Corporation, doing business as Fuller-Webb, a Joint Venture, and the Aetna Casualty and Surety Company, the Travelers Indemnity Company, the Home Insurance Company, Maryland Casualty Company, Fireman's Fund Insurance Company, Hartford Accident and Indemnity Company, General Reinsurance Corporation, North American Reinsurance Corporation, American Reinsurance Company and Employer's Reinsurance Corporation, Sureties, Defendants.

Civ. No. 2376.

United States District Court
D. Montana,
Great Falls Division.

Nov. 18, 1965.

Supplemental Opinion Feb. 17, 1966.

Howard Ellis, John L. Bordes, Chicago, Ill., Risken & Scribner, Helena, Mont., for plaintiffs.

J. J. Bottomly, Los Angeles, Cal., and Alexander, Kuenning & Hall, Great Falls, Mont., for defendants.

JAMESON, District Judge.

In this Miller Act case,[1] use plaintiffs seek recovery of $2,433.86 for Chemetron Corporation, $6,518.02 for Denver Oxygen Company, and $48,734.59 for Welders Supply Company, together with interest from April 25, 1962, costs and attorney fees.[2] The defendants are the prime contractor on a government contract and its sureties. Use plaintiffs furnished materials to a subcontractor. The case was submitted on stipulations, documents, and depositions.

### Findings of Fact

1. On February 28, 1961, the defendant George A. Fuller Co. and Del E. Webb Corporation, doing business as Fuller-Webb, a joint venture, entered into a written contract with the United States for construction of Minuteman facilities at Malmstrom Air Force Base, Montana. Fuller-Webb and the defendants The Aetna Casualty and Surety Co., The Travelers Indemnity Company, The Home Insurance Company, Maryland Casualty Co., Fireman's Fund Insurance Co., Hartford Accident and Indemnity Co., General Reinsurance Corp., North American Reinsurance Corporation, American Re-Insurance Company, and Employer's Reinsurance Corp. executed and delivered to the Government, in accordance with 40 U.S.C. 270a, a payment bond for the protection of all persons supplying labor and materials in prosecution of the work provided for in the contract.

2. On May 1, 1961, Fuller-Webb entered into a written subcontract with Idaho-Maryland Industries, Inc., whereby Idaho-Maryland was to fabricate and furnish a portion of the materials provided for in the principal contract. Pursuant to this subcontract Idaho-Maryland fabricated and delivered to Fuller-Webb certain items incorporated into and used in the completion of the principal contract.

3. Between November 8, 1961, and January 31, 1962 Chemetron Corp., acting through its National Cylinder Gas Division, furnished to Idaho-Maryland quantities of welding gases, equipment and supplies of the total value of $2,453.86, for which Idaho-Maryland agreed to pay Chemetron. The last materials furnished by this plaintiff to Idaho-Maryland were delivered on January 31, 1962.

4. Between August 1, 1961, and February 2, 1962 Denver Oxygen Company furnished to Idaho-Maryland quantities of welding gases, equipment and supplies for which Idaho-Maryland agreed to pay the sum of $6,518.02. The final date upon which materials were furnished to Idaho-Maryland by Denver Oxygen was February 2, 1962.

5. During the period from August 30, 1961, to February 1, 1962, Welders Supply furnished to Idaho-Maryland welding gases, materials and supplies for which Idaho-Maryland agreed to pay the sum

[1]. 40 U.S.C. § 270a et seq.

[2]. Use plaintiffs Denver Oxygen Company and Welders Supply Company are subsidiaries of Chemetron Corporation. The complaint has been amended to recite that effective November 30, 1965, the claims of Denver Oxygen Company and Welders Supply Company will be assigned to Chemetron Corporation. Thereafter the action will be continued in the name of Chemetron Corporation and for its benefit as successor in interest of the claims of Denver Oxygen Company and Welders Supply Company.

of $48,734.50. No materials were furnished to Idaho-Maryland pursuant to this arrangement after February 1, 1962.

6. On February 2, 1962, Idaho-Maryland filed a petition in bankruptcy for a plan of arrangement under Chapter XI of the Bankruptcy Act (11 U.S.C. 701 et seq.), in the United States District Court for the Southern District of California, Central Division. Subsequently, meetings of creditors were held and on October 19, 1962, an order confirming the plan of arrangement was entered by the Referee in Bankruptcy. Prior to the entry of this order the plaintiffs, on July 13, 1962, had filed with the Bankruptcy Court proofs of claim as unsecured creditors in the amounts claimed in the complaint. Each of these claims contained the following statement:

"By filing this Claim deponent does not waive any of its rights under the Miller Act and any and all such rights are hereby expressly reserved."

7. The records of the Bankruptcy Court contain certain documents entitled "Consent to Plan of Arrangement" filed on August 3, 1962 signed with the name "Kenneth Tremayne". These documents purport to contain consents on the part of the plaintiffs to the plan of arrangement filed in the bankruptcy proceedings. The weight of the testimony, however, shows that Tremayne, who was the proprietor of Nationwide Collection Service, had not signed the consents. Rather they were signed by his employee Vivian Fiene. Tremayne had not received any assignment of the plaintiffs' claims against Idaho-Maryland, nor did either he or Mrs. Fiene have any power of attorney or other written authorization giving them authority to consent to the arrangement.[3]

8. Pursuant to the plan of reorganization the plaintiffs, along with all the unsecured creditors whose claims had been allowed under the plan, were issued two shares of stock in the debtor corporation for each dollar of indebtedness claimed. The order of the Bankruptcy Court confirming the plan contained the following provisions:

"[T]he issuance of shares pursuant to the said plan shall be in cancellation, extinguishment and full settlement of all the claims of general, unsecured creditors receiving said shares * * *."

"[A]ll unsecured creditors of and all unsecured claimants against the debtor are hereby restrained and enjoined from pursuing or attempting to pursue or from commencing any suit or proceeding at law or in equity against the Debtor, directly or indirectly, upon any right, claim or interest which any such creditor or commencement of this proceeding."

9. On April 25, 1962, and within 90 days of the last date on which materials and equipment were furnished to Idaho-Maryland by the respective plaintiffs, the plaintiffs served written notice by registered mail upon defendant Fuller-Webb of their claims for the amounts owing to them by Idaho-Maryland for equipment and materials furnished in the prosecution of work under the prime contract.

*National Cylinder Gas Claim*

10. The National Cylinder Gas Division of Chemetron in the period from November 8, 1961, to January 31, 1962, furnished to Idaho-Maryland welding

3. Nationwide Collection Service had, in fact, received an assignment of one claim by National Cylinder Gas against Idaho-Maryland. This assignment was for a claim not involved in the instant case. There is also some conflict in the testimony on the authority of Nationwide to enter the consents. Mrs. Fiene acknowledged that she had signed Tremayne's name to the consents and that she would not have entered the amounts on the consent forms or signed them had she not had the information in the files of Nationwide. Tremayne's denial of any assignment of the claim or power of attorney, coupled with the lack of any proof that an assignment or authority was given to Nationwide preponderates against any authority in Tremayne to act for plaintiffs.

supplies, gases, and materials in the amount of $2,453.86. Of the original balance the sum of $2,228.09 remains due and owing. Approximately 90 percent of this item is for gases supplied and 10 percent for other materials. There is little direct evidence on this claim. The deposition of George M. Morton shows that during the period involved in this claim Idaho-Maryland was engaged in work on the principal contract in the Denver, Colorado area. Answers to Interrogatories to E. L. Lawson, District Manager of National Cylinder Gas, state, on the basis of information received from Idaho-Maryland employees, that the materials were going to the Fuller-Webb project.[4] There is no substantial proof to the contrary. Accordingly I find that plaintiff has sustained its burden of showing that the materials and supplies were furnished for and consumed in prosecution of the work under the contract.

### The Denver Oxygen Claim

11. Between August 1, 1961, and February 2, 1962, Denver Oxygen Co., a subsidiary of Chemetron and distributor for National Cylinder Gas, furnished Idaho-Maryland with welding supplies and equipment in the amount of $6,518.02. $6,490.84 remains unpaid on this claim. Of this claim $64.80 represents demurrage charges on gas cylinders loaned to Idaho-Maryland. Approximately 10 percent of the total claim is for equipment and supplies other than welding gases. From a review of the invoices covering the other equipment and supply items it appears that approximately one-third of these items were of the type which would be consumed in the ordinary prosecution of work on the Fuller-Webb project and were not capital equipment items.

The proof both supporting and opposing this claim is almost identical to that relating to the National Cylinder Gas claim. Accordingly, I find that the items represented by this claim were furnished for and substantially used in the prosecution of work on the Idaho-Maryland contract with Fuller-Webb.

### The Welders Supply Claim

12. Between August 30, 1961, and February 1, 1962, Welders Supply furnished to Idaho-Maryland welding gases, supplies and materials in the amount of $48,734.50. Of this amount 22 percent represents welding gases supplied, 15 percent represents Dual Shield supplied, 31 percent represents stick electrode supplied, and 32 percent represents other items supplied.

13. The purchases of the items involved in this claim were made by Iteeco-division of Idaho-Maryland at Studio City, California, and were utilized and consumed at its plant in Studio City. During the August 30, 1961–February 1, 1962, period the Iteeco plant was engaged in fabricating items for the Great Falls missile project pursuant to Idaho-Maryland's contract with Fuller-Webb. In this same period Iteeco was also doing contract work for the State of California, for Lockheed Aircraft Company, and on a Titan II program contract in Tucson, Arizona. The supplies and materials furnished by Welders Supply Co. with one exception were not segregated according to the job upon which they were to be utilized, nor under the operational set up of the Iteeco plant was it practical to do so. It is therefore apparent that a part of the items making up this claim were not used in prosecution of work under Idaho-Maryland's contract with Fuller-Webb.

14. Idaho-Maryland purchase order No. 15128–7 dated October 6, 1961, relates to the rental of nine "300 Amp. Portable Welding Machines" and bears the further explanation "5 Received 9/27/61 for Titan II and 4 For Freeway Program". Welders Supply invoices No.'s 2329, 1544, and 3561 indicate a total of $2,191.50 in rentals were charged for

---

4. The deposition of Morton states that he would "assume" a part of the materials were utilized on other than the Fuller-Webb project. This statement contains no indication of how much or what percentage of that furnished might have been used in other projects.

these machines during the August 30, 1961–February 1, 1962, period. These records clearly indicate the machines were not rented for the Fuller-Webb project and in the absence of any proof that they were in fact so used I conclude the $2,191.50 representing rentals for the machines is not a proper part of the claim.

15. There is some conflict in the evidence on the percentages of the materials furnished by Welders Supply which were actually consumed in prosecution of work on the Minuteman project. George J. Morton, former President of Idaho-Maryland testified that a "good portion" of the supplies would have been used on jobs other than the Fuller-Webb project. Other witnesses described the portions devoted to the Great Falls project as a "considerable amount", "major portion of the work", or "bulk of the work that was being done".

In my opinion the most reliable evidence on this point was furnished by Leland D. Baleme, the plant superintendent for Idaho-Maryland. Mr. Baleme was in charge of the Iteeco plant's operation and was thoroughly familiar with all the work projects being carried on in his plant. He estimated that 60 percent of all stick electrodes purchased from Welders Supply were used in the Great Falls work, 85 percent of the welding gases, and all of the Dual Shield.[5] Although there was some testimony that Dual Shield was used on other than the Great Falls project this is not supported by the evidence as a whole. I conclude that Baleme's figures should be accepted on gases and stick electrodes as well as Dual Shield.

16. The parties have stipulated that 32 percent of the total Welders Supply claim is for "other items" supplied to Idaho-Maryland. These items include

rental of welding machines as well as purchases of various types of welding materials and supplies. Excluding the welding machines shown to have been rented for other projects, the invoices reflect that $7,478 in rentals for welding machines is claimed by Welders Supply. A total of 31 machines were rented from plaintiffs. Nine of these were furnished for other projects and were not utilized in the Fuller-Webb project. Therefore it would appear that if 60 percent of the total electrode used by all machines was consumed in the Fuller-Webb work, at least 80 percent of the usage of the 22 remaining machines is allocable to the prime contract project.

17. The "other items" claim also includes certain demurrage charges by Welders Supply. These charges total $69.60. The balance of the equipment, supplies and services furnished as "other items" consists of approximately 19 percent "repairs and maintenance" expenditures, nine percent "production" supplies, 39 percent "small tools", nine percent "capital equipment", and 24 percent "non-production" supplies.[6] A review of the invoices reflects that the "production" and "non-production" materials were of the type which would be consumed in the ordinary prosecution of the work carried on by Idaho-Maryland. In light of all the evidence relating to the allocation of work by Idaho-Maryland at its Iteeco plant to the Fuller-Webb and to other projects I conclude that at least 65 percent of all these items were either devoted to or consumed in the Fuller-Webb contract work.

*Discussion*

 · The defendants initially contended that Idaho-Maryland was not a subcontractor of Fuller-Webb, but rather occupied the position of material supplier.

5. Dual Shield is a patented welding process owned by National Cylinder Gas which utilized a flux cord wire and a semi-automatic welding machine. The invoices relating to this portion of the claim reflect that the welding machines were rented from Welders Supply and the special flux cord were purchased. The machine rental comprises about 15 percent of the total of this segment of the claim.

6. This breakdown is based on classification code numbers on the Idaho-Maryland purchase orders.

In their post-trial brief this contention was withdrawn. In any event, it is clear that Idaho-Maryland was a subcontractor of Fuller-Webb under the definition set forth in Clifford F. MacEvoy Co. v. United States for Use and Benefit of Calvin Tomkins Co., 1944, 322 U.S. 102, 109, 64 S.Ct. 890, 894, 88 L.Ed. 1163: "[A] subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract * * *."[7] It is equally clear that plaintiffs furnished material to the subcontractor for the prosecution of work under the prime contract. Accordingly, they are within the class of material suppliers protected by the Act.[8]

Defendants contend, however, that even though plaintiffs initially were within the class of material suppliers protected by the Act, there is no liability on the part of the defendants for the reasons that (1) the securities accepted in the bankruptcy proceedings constituted "payment in full for all purposes of the claims" involved in this action, and (2) plaintiffs failed to comply with the notice requirements of the Miller Act. It is further contended that (3) not all of the materials for which claim is made were furnished for the Minuteman project, and (4) in any event, plaintiffs are not entitled to interest.

### Effect of Acceptance of Securities in Bankruptcy Proceedings

Defendants' contention that plaintiffs are barred by their participation in the bankruptcy proceedings may be summarized as follows: Plaintiffs as creditors are entitled to but one recovery for the total of the debt from both the principal debtor and the sureties; the arrangement, being in the nature of a contract between the creditor and the debtor, is binding upon them; under the terms of the arrangement the stock issued in the debtor corporation was in "full settlement of all claims of * * * creditors receiving" such stock and as a result the debt itself was discharged; the debt having been discharged there was nothing left upon which the sureties could be held; and the sureties not being liable the prime contractor cannot be held liable.

While it is true that the obligation of the bankrupt was discharged through the acceptance of the securities in the bankruptcy proceedings, it does not follow that this relieves the obligors under the payment bond from their liability to plaintiffs. In other words, the plan of arrangement and the order of the bankruptcy court entered pursuant thereto could not *per se* affect the contractual obligations of the sureties. The sureties were not parties to the arrangement, and the arrangement plan does not purport to affect them directly. It was beyond the power of the bankruptcy court to affect the independent contract of guaranty by the arrangement proceedings. In re Nine North Church Street, Inc., 2 Cir. 1936, 82 F.2d 186; In re Diversey Bldg. Corporation, 7 Cir. 1936, 86 F.2d 456,[9] cert. den. Diversey Bldg. Corp. v. Weber, 300 U.S. 662, 57 S.Ct. 492, 81 L.Ed. 870.

Section 34 of Title 11 U.S.C. provides: "The liability of a person who is a

---

7. See also, Basich Bros. Const. Co. v. United States for Use of Turner, 9 Cir. 1946, 159 F.2d 182; Elmer v. United States Fidelity & Guar. Co., 5 Cir. 1960, 275 F.2d 89, cert. den. 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727; United States for Use and Benefit of Whitmore Oxygen Co. v. Idaho Crane & Rigging Co., D.Idaho 1961, 193 F.Supp. 802.

8. Section 270b(a) of the Miller Act provides in part:
 "[A]ny person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond * * *."
 See Clifford F. MacEvoy Co. v. United States for Use and Benefit of Calvin Tomkins Co., supra, and cases cited in footnote 7.

9. While not in point factually, these cases do support the conclusion that the action of the bankruptcy court does not affect the liability of guarantors who are not parties to the bankruptcy proceedings.

co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt."

In re Lancaster, W.D.Mo.1941, 38 F. Supp. 318, involved proceedings under Chapter 13 of the Bankruptcy Act, 11 U.S.C. § 1001 et seq., referring to wage earners' plans. In holding section 34 applicable to the proceeding, Judge Reeves reasoned:

> "When the Congress enacted the statutes pertaining to wage earners' plans, Section 1002, Title 11, specifically provided as follows: 'The provisions of chapters 1 to 7, inclusive, of this title shall, insofar as they are not inconsistent or in conflict with the provisions of this chapter, apply in proceedings under this chapter.'

> "While there are limited exceptions in said Section 1002, yet Section 34, supra, is not one of them. It was clearly the intention of the Congress to make applicable to proceedings under said Chapter 13 the specific provisions of Section 34. Such section does not have to be construed. It simply states that the liability of a co-debtor, guarantor or surety for 'a bankrupt shall not be altered by the discharge of such bankrupt.'"

This reasoning is applicable to the instant case. Section 702 is very similar in its language to section 1002 and contains a sentence identical to that quoted in Judge Reeves' opinion.

Collier in his treatise on bankruptcy states that Section 34 is applicable where the discharge is affected by arrangement, as was the case here, or by corporate reorganization proceedings. 1 Collier, Bankruptcy, par. 16.02 at 1525. (14th ed. 1964). The defendant, however, argues that Section 34 has no applicability in the instant case because, 'If the stock is in full settlement of the claims, there is nothing left for the surety to pay." This argument brings us to the question: What was the scope of the arrangement?

The case most nearly in point is Union Trust Co. of Rochester v. Willsea, 1937, 275 N.Y. 164, 9 N.E.2d 820, 112 A.L.R. 1175. In that case the defendant was guarantor for all indebtedness of a New York corporation, Willsea Works. The corporation filed a petition for corporate reorganization in the United States District Court, and the plaintiff filed its claim in the federal court proceedings. The plan of reorganization which was approved and carried out by the principal debtor provided for payment in full to its creditors by the issuance of new stock with a stated par value. The stock was issued and plaintiff received a specified number of the shares. An action was subsequently brought in the New York state court against the defendant guarantor. The defendant pleaded that the obligation had been satisfied and paid in full. The court rejected this contention, saying:

> "It is urged that the acceptance of that stock and participation by the respondent in the proceeding in the District Court constituted full payment of the guaranty agreement. The appellant relies upon the elementary principal of the law of suretyship, that the payment or satisfaction of the principal obligation discharges the guarantor, and asserts that the provision of the order of the District Court that the delivery of the stock in pursuance of the terms of the order should constitute payment in full of the principal debt. There is no doubt about the principle relied upon by the appellant. (Citing cases).

> "We think, however, that the principle has no application in the situation here presented. The proceeding under section 77B involved the debtor and its creditors. It did not, in any way, affect the independent guaranty agreement entered into between the respondent and appellant, and the District Court had no jurisdiction to adjudge that the claim was by the proceeding paid and discharged. True it is that respondent

had made itself a party to that proceeding as a creditor of the bankrupt as it had a right to do as a creditor and as a creditor it received by virtue of the decree of the District Court the new stock issued by the bankrupt. The proceeding under section 77B is subject to all other applicable provisions of the Bankruptcy Act, but we are referred to no provisions of that law whereby a guarantor of a debt of the bankrupt is relieved of liability on account of a debt of the bankrupt as the result of a proceeding under section 77B unless such guarantor has himself been adjudicated not liable in a proceeding instituted by or against him as a result of his own insolvency. There is no contention that the appellant is insolvent or that he has been discharged in bankruptcy or has petitioned for a composition or extension of time to pay his individual debts under section 74 of the Bankruptcy Act. * * * Section 16 * * * thereof expressly provides that the liability of one who is a guarantor or surety for a bankrupt shall not be altered by the discharge of such bankrupt. (Citing cases).

"By analogy, the cases are applicable which hold that a composition in bankruptcy between a principal debtor and holders of instruments issued by it does not discharge the liability of endorsers, sureties, or guarantors upon such instruments, even though they participate in the composition proceeding as creditors of the principal debtor and accept dividends on the instruments from the maker. (Citing cases).

"Respondent, in accepting the new stock, did not accept it as payment or partial payment of its claim. There is no allegation in the answer as to the value of the stock. For all that appears, it may not have any value. True it is that respondent cannot have payment of its claim and also retain the stock. Upon payment by the appellant of the judgment, he will be subrogated to the rights of the respondent in the stock."

The defendants attempt to distinguish the Willsea decision by arguing that in the instant case the claims were extinguished by the issuance of the stock and no debt remains for anyone to pay. This reasoning reads too much into the bankruptcy court's actions. As noted supra, the bankruptcy court could not directly affect the independent contract of guaranty. The discharge of the debtor under the arrangement was by operation of law and was not a voluntary act on the part of the plaintiffs. Whatever may be the effect of the discharge upon plaintiffs' rights against Idaho-Maryland, the sureties' obligations on the bond are not affected. The discharge simply does not reach the sureties and is not a defense to them. See In re American Paper Co., D.N.J.1919, 255 F. 121; Winter v. Trepte, 1940, 234 Wis. 193, 290 N.W. 599; Northern Drug Co. v. Abbett, 1939, 205 Minn. 65, 284 N.W. 881, 121 A.L.R. 1349. The plaintiffs are not precluded from maintaining this action because of the provisions of the arrangement plan and bankruptcy court's order.

The plaintiffs of course are entitled to only one recovery for their claims. They have agreed to turn over to the defendants, upon payment of their claims, the shares of stock which they received in the arrangement proceeding.

### Notice Under Miller Act

The defendants next contend that the notice provisions of the Miller Act were not complied with in that "notices were not given within ninety days [10] upon separate and distinct contracts none of which was for the supplying of material under a specified prime

10. Section 270b(a) requires "written notice to said contractor within ninety days from the date on which such person

* * * furnished or supplied the last of the material for which such claim is made * * *".

contract."[11] The materials were supplied on a purchase order basis and there was no single agreement covering all the purchases. Because of this factor the defendants seek to have each shipment treated as a separate and independent contract, requiring notice to be given within 90 days from the day the particular delivery was made. The cases dealing with this question which are most nearly in point are United States for Use and Benefit of J. A. Edwards & Co. v. Bregman Const. Corp., E.D.N.Y. 1959, 172 F.Supp. 517 and Noland Company, Inc. v. Allied Contractors, Inc., 4 Cir. 1959, 273 F.2d 917.

In the J. A. Edwards & Co. case plaintiff, a supplier of a subcontractor, had furnished materials to the subcontractor pursuant to a series of separate orders received from the subcontractor. There was no entire contract for all the materials so furnished; nor did the parties handle the orders and materials on a running account basis. Notice was given within 90 days of the date upon which the last materials were furnished. In rejecting the defendant's argument that a separate notice on each order and delivery was required the court stated:

"The plain words of limitation upon the right of this use plaintiff to sue on the payment bond are that the 90 day notice be given 'within ninety days from the date on which such person * * * furnished or supplied the last of the material for which such claim is made * * *.' The 90 day period is not stated to be measured from the date of the last delivery of material under an entire contract or on a running account or under each separate order. The Miller Act contemplates one such notice within 90 days from the furnishing of the last material furnished in the prosecution of the prime contract from which claim is made. If the material is so furnished pursuant to one entire contract, obviously the measuring date will be the date when the last material is so furnished. If the material is furnished pursuant to a series of separate contracts, the measuring date will be the date when the last material is furnished under the last contract. This is the internal sense of the Miller Act. It should be construed sensibly and its plain purposes should not be defeated by a narrow interpretation.

"The interpretation of § 270b(a) urged by the defendants would lead to absurd results. * * * Every material man of every subcontractor who furnished materials pursuant to separate orders, rather than pursuant to one entire contract, would be required to serve separate notices as to each such separate contract, even though the separate contracts were all related to the prosecution of the work provided for in the main contract. The office of a prime contractor who has undertaken to construct a large public building, such as the Pentagon, for example, might be flooded with 90 day notices from every unpaid day-to-day laborer employed by numerous subcontractors and by every person furnishing materials to numerous subcontractors. The offices of the sureties of such a prime contractor would also be flooded with correspondence and, conceivably, copies of the claims of laborers and material men. Were this court to yield to the argument of these defendants, contractors and sureties throughout the country would be compelled to seek Congressional relief in the form of an amendment to 270b.

"There is no merit to the defendants' interpretation of this statute. It is supported neither by the language of the Miller Act nor by logic, common sense or precedent." (172 F.Supp. at 522–523).

The Noland Company case, like J. A. Edwards & Co., supra, involved materials

---

11. The form of the notice is not questioned and no issue is raised on this point.

supplied to a subcontractor on an "over the counter" purchase and order basis. The Court of Appeals for the Fourth Circuit reversed the district court (United States to Use of Noland Co. v. Allied Contractors, Inc., D.C.Md., 171 F.Supp. 569) which had held that separate notices were required. In so doing the court quoted with approval from Judge Zavatt's opinion in J. A. Edwards & Co., and said further:

"It is true that the notice provision of the Miller Act is designed to afford protection to the prime contractor by fixing the date beyond which, in the absence of notice, he will not be liable for the subcontractor's debts; but this purpose, although important in itself, is subsidiary to the main purpose of the act to protect those whose labor and materials enter into the prosecution of the work; and if there be any ambiguity in the provisions relating to the minor purpose, it should be resolved in support of the main object of the law. We believe this construction to be in harmony with the repeated decisions that hold that the statute should be liberally construed so as to effect its salutary purpose." (273 F.2d at 920, 921).[12]

The defendant attempts to distinguish these opinions by pointing out that in each of the cases there was no evidence that any of the materials supplied by the plaintiff had been utilized in other prime contracts. I do not find this argument persuasive. It is true that in the instant case some of the materials supplied by plaintiffs were incorporated into or used on projects other than the Fuller-Webb contract. This factor relates to the amount which the plaintiffs may recover and not to the basic purposes of the notice provisions of the Miller Act.

Here notice was given within 90 days of the date the last materials were furnished to Idaho-Maryland. In light of the cases cited and discussed supra, I conclude the notices were timely.[13]

■■ We come now to a consideration of the amounts which the plaintiffs are entitled to recover on the various claims. Before considering each claim individually it seems advisable to state some of the general rules applicable to all the claims. It is well settled that a supplier suing on a Miller Act bond does not have to prove that the materials supplied were actually incorporated into the contract. "All that is required is proof that the labor or material was *furnished* in the prosecution of the work provided for in the prime contract * * *." United States for Use and Benefit of Warren Painting Co. v. J. C. Boespflug Const. Co., 9 Cir. 1963, 325 F.2d 54, 62. (Emphasis added).[14] Although the Miller Act is to receive a liberal construction to effectuate its protective purposes (United States for Benefit and on Behalf of Sherman v. Carter, 1957, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776; Apache Powder Co. v. Ashton Co., supra) the surety, of course, is liable only for material sup-

---

12. This conclusion is consistent with the decisions of the Ninth Circuit in Apache Powder Co. v. Ashton Co., 1959, 264 F. 2d 417, and United States for Use and Benefit of Miller & Bentley Equipment Co. v. Kelley, 1964, 327 F.2d 590. While the notice was held insufficient in the latter case, Noland Company v. Allied Contractors, Inc., was cited in footnotes 2 and 3.

13. The defendants also argue that because the plaintiffs put Idaho-Maryland on a C.O.D. basis after the bankruptcy proceeding was initiated the separate notice rule should apply. In support of this argument they cite and quote from United States for Use and Benefit of Industrial Instrument Corp. v. Paul Hardeman, Inc., N.D.Tex.1962, 202 F.Supp. 124. That case involved the Miller Act rights of a supplier who had breached its contract with the subcontractor. It was held that the subcontractor accordingly was justified in cancelling the contract, and that by reason of the breach the supplier lost all rights and protection it had under the Miller Act. It does not appear that this case is in point here.

14. See also Continental Casualty Co., Inc. v. Allsop Lumber Co., 8 Cir. 1964, 336 F. 2d 445; Roscoe-Ajax Const. Co. v. United States for Use of Taylor Products Corp., 9 Cir. 1965, 351 F.2d 305.

plied in connection with the bonded contract. It cannot be held for items which were furnished for projects not covered by the bond. United States ex rel. Carter-Schneider-Nelson, Inc. v. Campbell, 9 Cir. 1961, 293 F.2d 816.[15]

██ If the materials are "furnished" for prosecution of work under the prime contract the supplier is not precluded from recovering therefor by the fact that the items were not totally consumed in the performance of the contract. What constitutes "materials furnished", however, has not been clearly defined by the courts. The definition depends upon the facts and circumstances of each case. United States for Use and Benefit of J. P. Byrne & Co. v. Fire Association of Philadelphia, supra.

██ Rental charges for equipment furnished to perform work on the contract are recoverable under the bond. United States for Use and Benefit of P. A. Bourquin & Co. v. Chester Const. Co., 2 Cir. 1939, 104 F.2d 648; Massachusetts Bonding & Ins. Co. v. United States for Use of Clarksdale Machinery Co., 5 Cir. 1937, 88 F.2d 388, Cf. United States for Use and Benefit of Jeager Machine Co. v. S. Birch & Sons Const. Co., D.Mont. 1941, 43 F.Supp. 726. However, if an item purchased is one of capital equipment which is not substantially consumed in the work to be done it is not recoverable under the Act. Massachusetts Bonding and Insurance Co. v. United States for Use of Clarksdale Machinery Co. supra; United States to Use of Galliher & Huguely, Inc. v. James Baird Co., 1934, 64 App.D.C. 12, 73 F.2d 652; United States for Use and Benefit of J. P. Byrne & Co., Inc. v. Fire Association of Philadelphia, supra. And, in accordance with the "substantial consumption" rule a recurring expense in maintaining, as distinguished from replacing equipment, is covered. Massachusetts Bonding & Insurance Co. v. United States for Use of Clarksdale Machinery Co., supra, and cases there cited at 88 F.2d 389.

██ Whether freight and demurrage charges are within the scope of a public contract bond has been decided both in favor of (Title Guaranty & Trust Company of Scranton, Pennsylvania v. Crane Co., 1910, 219 U.S. 24, 31 S.Ct. 140, 55 L.Ed. 72; United States for Use of United States Rubber Co. v. Amburnsen Dam Co., N.D.Cal.1933, 3 F.Supp. 548; Standard Accident Ins. Co. v. United States for Use and Benefit of Powell, 5 Cir. 1937, 89 F.2d 658) and against (Mandel v. United States to Use of Wharton & N. R. Co., 3 Cir. 1925, 4 F.2d 629; United States ex rel. and to Use of Robert S. Green, Inc. v. C. & W. Const. Co., D.Md.1937, 20 F.Supp. 879) such charges. Bearing in mind the purposes of the act and the liberal interpretation it is to receive, the cases allowing demurrage are more applicable to the demurrage charges claimed here. The claims for demurrage should be allowed.

### National Cylinder Gas Claim

All of the materials supplied by National Cylinder Gas were furnished for the Fuller-Webb project and were substantially consumed in prosecution of work thereunder. The full balance of $2,228.09 which remains due and owing should be allowed.

### Denver Oxygen Claim

██ $6,490.84 remains due and owing on the Denver Oxygen claim. As noted supra, 90 percent of this sum is for welding gases furnished for the Great Falls project. This amount, $5,841.76, should be allowed. Of the remaining 10 percent, $64.80 represents demurrage and should be allowed. Approximately two-thirds of the balance of the 10 percent are items in the nature of permanent equipment. In the absence of any proof that this equipment was substantially depreciated or consumed in the prosecution of the work, an allowance for these items would be improper. The one-third ($194.76) which represents equipment of the type normally consumed in prosecu-

15. See also United States for Use and Benefit of J. P. Byrne & Co. v. Fire As- sociation of Philadelphia, 2 Cir. 1958, 260 F.2d 541, 545 and cases there cited.

tion of the work being carried on by Idaho-Maryland should be allowed. Accordingly I find that the following sums are recoverable under the bond:

| | |
|---|---|
| Gases consumed | $5,841.76 |
| Demurrage | 64.80 |
| Other items | 194.76 |
| Total claim | $6,101.32 |

### Welders Supply Claim

■ A total of $48,734.50 is claimed by Welders Supply. The proof, however, in light of the applicable law clearly does not entitle Welders Supply to the total amount. Welders Supply was aware that Idaho-Maryland was engaged in several operations at its Iteeco plant, and it was furnishing welding supplies and materials for all the projects. Therefore it cannot be said that Welders Supply was in good faith furnishing all the supplies for use on the Great Falls project. Under the circumstances it can recover only for those materials which relate to the Fuller-Webb contract.

All the dual shield purchased by Idaho-Maryland was devoted to the Great Falls project. It represents 15 percent of the total claim or $7,310.18. This amount should be allowed.

Twenty-two percent of the total claim is for gases. This amounts to $10,721.59. Since 85 percent of the gases were devoted to the prime contract, $9,113.35 should be awarded for this part of the claim.

Stick electrode comprises 31 percent of the total claim, or $15,107.70. Of this amount 60 percent is allocable to the prime contract. Thus the total allowance here is $9,064.61.

■ It was stipulated that 32 percent of the total claim was for equipment of other than the types discussed above. This part of the claim totals $15,595.07. From this figure $2,191.50 must be deducted for rentals of machines rented for use on other projects. Of the other machine rentals plaintiffs are entitled to recover for that portion allocable to the Fuller-Webb contract. Using the total welding machines on the project and the percentages of Stick electrode devoted to the Fuller-Webb contract as a basis, I have concluded that 80 percent of the $7,478 welding machine rentals charged (exclusive of the $2,191.50 for other projects) is chargeable to the bonded contract. Cf. United States ex rel. Carter-Schneider-Nelson, Inc. v. Campbell, supra, at 293 F.2d 818–819. The amount of this portion of the claim is thus $5,982.40. In awarding this amount I am not unmindful of the plaintiffs' argument, citing Friebel and Hartman, Inc. v. United States for Use of Codell Construction Co., 6 Cir. 1956, 238 F.2d 394, that the total rental cost should be allowed because the equipment was available for the Fuller-Webb contract during the entire period. Here, however, we have a situation where all the equipment furnished was apparently used on all jobs being carried on by Idaho-Maryland and clearly the bond does not cover work done on non-bonded projects. United States ex rel. Carter-Schneider-Nelson, Inc. v. Campbell, supra.

■ The balance of the 32 percent "other items" portion of the claim is for repairs, demurrage and various types of equipment furnished to Idaho-Maryland. The defendant contends none of these items are recoverable, while the plaintiff argues that the full amount should be allowed. Plaintiffs base their position on the fact that the Idaho-Maryland shop was operating on a 24 hour basis for a portion of the period during which the equipment was furnished.

The plaintiffs' argument ignores two important facts: first, all the items were not in good faith "furnished" for the Fuller-Webb project; and second, there is no proof in the record, except for that relating to the 24 hour a day operation that the materials were "substantially consumed" in the prosecution of work under the prime contract.

■ Viewing the evidence as a whole I have concluded that 65 percent of the total "other items" claim is allocable to the bonded project. After a review of

the testimony by deposition and interrogatories and the invoices I am of the opinion that, in the absence of proof, the "Capital Equipment" and "Small Tools" items were not substantially consumed in the prosecution of work under either the bonded contract or the other projects carried on by Idaho-Maryland. No allowance can be made for these items. However, the "Production" supplies and those coded "Non-Production" were of the type which normally would be consumed in the prosecution of work. Therefore 65 percent of these two items or a total of $1,534 may be awarded to plaintiff. Likewise 65 percent of the rentals claim (exclusive of welding machine rental) or $857.35 is chargeable to the bonded contract. As with the Denver Oxygen claim, the plaintiff is entitled to recover the $45.24 representing 65 percent of the demurrage.

Accordingly, I find that the following amounts are recoverable on this claim:

| | | |
|---|---|---|
| 1. | Dual Shield | $ 7,310.18 |
| 2. | Stick Electrode | 9,064.61 |
| 3. | Gases | 9,113.35 |
| 4. | Other Items | |
| | Rentals (welding vouchers) | 5,982.40 |
| | Demurrage | 45.24 |
| | Production and Non-Production | 1,534.00 |
| | Rentals (other equipment) | 857.35 |
| | TOTAL | $33,907.13 |

### Interest

█ The plaintiffs' claim for interest is governed by the law of Montana. Illinois Surety Co. v. John Davis Co., 1917, 244 U.S. 376, 37 S.Ct. 614, 61 L. Ed. 1206; Continental Casualty Co. v. Clarence L. Boyd Co., 10 Cir. 1944, 140 F.2d 115. The applicable Montana statute provides:

"Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt." (R. C.M. 1947, section 17–204).

In the case of Eskestrand v. Wunder, 1933, 94 Mont. 57, 20 P.2d 622, the plaintiff, a mechanic's lien claimant, considerably overstated the amount of his claim, including several items to which he was not entitled. The judgment in favor of the plaintiff contained an award for interest from the date of the commencement of the action. In holding the interest award improper the Montana court stated at 94 Mont. 66–67, 20 P.2d 625:

"His action was not on 'an account stated' nor had the balance due him been ascertained. His claim for damages for the breach of the contract to pay according to agreement, as set out in his complaint, was not 'certain' nor could it be made certain by mere 'calculation,' which here means a determination by mathematical computation. Webster's Int. Dictionary. To determine the amount due required evidence on the trial, which here took the form of admission on the part of the plaintiff that he had included items in his account to which he was not entitled."

\* \* \* \* \* \*

"Had the plaintiff by his complaint demanded the amount to which he was justly entitled, he should be entitled to interest on that amount from the commencement of the action, but, as pointed out, his 'demand' was far in excess of the amount to which he was entitled. The defendant could not, on that demand, pay the amount demanded and thus prevent the addition of interest. True, defendant might have tendered the amount justly due (citing cases) and thus stopped the running of interest, but it is not shown that she had any means of knowing what was justly due the plaintiff; this by reason of plaintiff's own negligence in failing to

render an account and in suing for an excessive amount. Under the circumstances, the correct rule is that interest is not allowable until the exact amount due is ascertained (or ascertainable by mathematical computation), so that payment or tender could have been made at the proper time. (Citing cases). In the instant case, in order to ascertain the amount due, 'it took the judgment of the court to decide' (citing cases) and therefore interest should have been allowed only on the amount found by the court to be justly due from the defendant to the plaintiff, and is allowable only from the date of the decision rendered." [16]

The plaintiff cites Federal Land Bank of Spokane v. Green, 1939, 108 Mont. 56, 90 P.2d 489, as being "on all fours" with the instant cause on the issue of interest. In that case it was held that the claimant in a mechanic's lien foreclosure was entitled to interest from the date the amounts became due. The account which was filed with the lien contained some items which had not gone into the dwelling house upon which the lien was perfected. In passing upon the validity of the interest award the court stated:

"Green, the debtor, was obligated to pay the entire amount claimed in the cross-complaint. He was not prevented by law or by the act of the creditor from paying the debt. He is clearly obligated to pay interest on the entire claim. True, as against the bank and Fargen, the lien contained items which did not go into the building in question, and, hence, cross-complainant overstated the amount of his lienable claim; but the correct amount going to make up the lien was readily ascertainable. It could have been ascertained by the simple expedient of consulting Green and without even consulting

cross-complainant. Green frankly stated at the trial just which items went into the building and which did not. There was no offer of payment of the amount which Green admits was lienable so as to stop the running of interest as provided in sections 7446 and 7450, Revised Codes. The court did not err in allowing interest on the amount of the lien." (108 Mont. at 67, 90 P.2d at 493, 494).

Plaintiffs argue that, "The defendants, by consulting Baleme, could have made a similar determination and then offered to pay the reduced amount so as to stop the running of interest as provided in sections 58–423 and 58–427, of the Revised Codes." I cannot agree with plaintiffs' position. Although this court has found that Baleme's testimony gave the most accurate picture of aspects of the Welders Supply claim "it took a judgment of the court to decide" the actual amounts due. Until all the evidence was considered and weighed the claim was not " 'certain' nor could it be made certain by mere 'calculation'." The same is true for the Denver Oxygen claim. However, with the National Cylinder Gas claim there was never any real dispute over the amount due and "it could have been ascertained by the simple expedient of consulting" plaintiffs. The interest award here is proper.

Finally the plaintiffs claim they are entitled to reasonable attorney's fees. This question is settled in the plaintiffs' favor by United States for Use and Benefit of Western Steel Co. v. Reliance Insurance Company of Philadelphia, D. Mont.1964, 227 F.Supp. 939 (decision by Honorable William G. East), and followed in unreported decision in United States for Use of Robinson Brick & Tile Co. v. J. G. Watts Construction Co., Havre-Glasgow Division Civil No. 2340, August 24, 1965.[17] The parties may sub-

---

16. The same rule has been followed by the Court of Appeals for the Ninth Circuit in construing Cal.Civ.Code § 3287, from which R.C.M.1947, section 17–204 was taken. United States ex rel. Carter-Schneider-Nelson, Inc. v. Campbell, 9 Cir. 1961, 293 F.2d 816, 819.

17. Both parties seek attorney fees, so apparently the propriety of allowing a fee to the prevailing party is not questioned.

mit proof, either orally or through affidavits, on the amount of attorney fees to be awarded plaintiffs.

#### Conclusions of Law

1. This court has jurisdiction under 40 U.S.C. § 270a et seq. (Miller Act).

2. The plaintiffs are not barred from recovery by their participation in the proceedings in the matter of the bankruptcy of the subcontractor, Idaho-Maryland Industries, Inc., and their acceptance of stock issued to all unsecured creditors of the bankrupt.

3. The plaintiffs gave the notice required by 40 U.S.C. § 270b(a).

4. The respective plaintiffs are entitled to recover the following amounts for materials furnished to Idaho-Maryland, a subcontractor of the defendant Fuller-Webb, in the prosecution of work provided for in the prime contract between the United States of America and Fuller-Webb:

| | | |
|---|---|---|
| a. | Chemetron Corporation (National Cylinder Gas Claim) | $ 2,228.09 |
| b. | Denver Oxygen Company | 6,101.32 |
| c. | Welders Supply Company | 33,907.13 |

5. The plaintiff Chemetron Corporation is entitled to interest at 6 percent per annum from April 25, 1962, on the National Cylinder Gas Claim. The plaintiffs Denver Oxygen Company and Welders Supply Company are not entitled to interest.

6. Plaintiffs are entitled to an award of attorney fees, the amount to be determined by the court after submission of proof by the respective parties.

The discussion herein contained shall be considered as part of the findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Pursuant to Rule 11(b) of the local rules of court, plaintiff will prepare, serve and lodge form of judgment.

### SUPPLEMENTAL OPINION
#### Allowance of Attorney Fees

In support of their application for allowance of reasonable attorney fees, plaintiffs have submitted itemized statements showing that the fees incurred total $18,615.00. An affidavit of John L. Bordes, a member of the firm of Kirkland, Ellis, Hodson, Schaffetz & Masters, of Chicago, Illinois, recites that between January 2, 1962, and November 1, 1965, his firm expended a total of 315 hours and that the reasonable value of their services was $35.00 per hour, making a total of $11,025.00. Apparently five partners (or associates) of the firm devoted time to the case. An affidavit of A. W. Scribner of Helena, Montana, recites that between January 18, 1963, and November 1, 1965, he expended a total of 253 hours and that the reasonable value of his services was $30.00 per hour, making a total of $7,590.00. Computed on the basis of a six hour day, this represents a total of 92⅔ days at the rate of $210.00 a day for 52 plus days and $180.00 a day for 42 plus days.

Plaintiffs asserted claims totalling $57,706.47. The court allowed recovery of $42,236.53. The fees incurred represent 32 percent of the amount claimed and 43 percent of the amount recovered. There is no suggestion that the case was handled on a contingent fee basis.

An affidavit of John C. Hall of counsel for the defendants recites that the fee schedule adopted by the Cascade County Bar Association and Montana Bar Association provide a minimum fee of $20.00 per hour, and that this amount is customarily charged by lawyers in Great Falls, where this case was tried. In general, if an award of attorney fees is allowed pursuant to statute or court rule, the court is guided by the local court and bar association rules.

Defendants argue that each party has prevailed on some of its contentions; that the claims of plaintiffs have been reduced materially by the court's findings; that there is nothing to move the court's discretion to allow attorney fees for either party; and that if any fee is allowed, the amount requested is excessive.

The question of allowance of attorney fees in Miller Act cases was most recently considered by the Court of Appeals for the Ninth Circuit in Macri v. United States for Use of John H. Maxwell & Company, Inc., 9 Cir. 1965, 353 F.2d 804. In that case a subcontractor sought to recover the unpaid balance on its contract plus compensation for extra work, and the contractor in turn sought damages for delay in performing the contract and for poor workmanship. Following a protracted trial the court found in part for both parties, resulting in a net balance due the subcontractor of $68,972.37. The trial court allowed interest in the amount of $17,266.28, but denied attorney fees. In affirming, the Court of Appeals recognized that the law of Alaska permitted recovery of attorney fees, "but whether or not an allowance should be made is a matter for the trial court to decide in the exercise of sound discretion". The court continued: "It is true that Maxwell recovered a larger percentage of its claim and a larger monetary sum than Macri, but these facts alone in a case as involved as this one do not in our estimation necessarily establish that the experienced trial court was acting capriciously in ruling against Maxwell." (353 F.2d at 811).

There are factual differences between this case and Macri v. United States for Use of John H. Maxwell & Company, Inc. particularly in the fact that the contractor in Maxwell also recovered damages on its cross-claim. I am persuaded that an allowance of some fee is justified, but under all the circumstances an award of the total fee incurred would be grossly excessive.

It is true that plaintiffs prevailed on two of the principal legal issues, i. e.,

the effect of the acceptance of securities in the bankruptcy proceedings involving the subcontractor, Idaho-Maryland Industries, Inc., and the sufficiency of the notice under the Miller Act. Defendants prevailed on the third legal issue—the allowance of interest.

On the factual issues of whether certain materials were furnished in connection with the Fuller-Webb contract and whether other materials were "substantially consumed" in the prosecution of the work, neither side prevailed in toto. Rather the amounts claimed by plaintiffs were substantially reduced. I cannot escape the conclusion that if plaintiffs had maintained more complete records, a substantial amount of the time devoted by plaintiffs' attorneys (as well as the court) to these factual issues would have been saved. On the other hand, it cannot be overlooked that the defendants entered into a subcontract with a corporation which later became insolvent and that the plaintiffs in furnishing materials to the subcontractor had a right to rely upon the payment bond required by the Miller Act.

Insofar as amounts are concerned, of the claim asserted on behalf of Welders Supply in the amount of $48,734.59, recovery was allowed for $33,907.13. In other words, the defendants prevailed to the extent of $14,827.46 on this particular claim. Of the claim of Chemetron Corporation for $2,433.86, recovery was allowed for $2,228.09; and of the claim of Denver Oxygen Company for $6,518.02, recovery was allowed for $6,101.32.

The case was submitted on stipulations, depositions, and exhibits, with the result that less than one day was required for court appearances, including a pretrial conference. Eight depositions were taken in Los Angeles. While less than two days were expended in taking the depositions, it was of course necessary for counsel to travel to Los Angeles, and additional time was expended in examining exhibits and conferring with witnesses in advance of the depositions.

From the court's own research of the legal questions and examination of the

numerous exhibits, it is clear that a substantial amount of time was expended by both parties in preparing the case for submission to the court.

As counsel for the defendants have pointed out in their memorandum, there was substantial duplication of work on the part of plaintiffs' counsel. To a large extent this cannot be avoided when a party is represented by both resident and nonresident counsel. It should be noted, however, that both Chicago counsel and Helena counsel traveled to Los Angeles for the depositions, both participated in the pretrial conference, and both worked on the preparation of briefs. For example, Mr. Bordes and members of his firm expended some 65 hours and Mr. Scribner 22 hours in the preparation of plaintiffs' reply brief. Counsel for the defendants also point out that a rather substantial amount of time was expended in long distance telephone conversations, conferences among attorneys, exchange of correspondence, and miscellaneous correspondence of a routine nature, most, if not all, of which was no doubt necessary. These are factors, however, which must be taken into consideration in determining what allowance should be made to plaintiffs for attorney fees.

On the other hand, as counsel for plaintiffs argue, defendants did resist plaintiffs' claims in their entirety and interposed a number of legal objections, one of which was subsequently abandoned after it had been briefed by counsel for the plaintiffs.

■ It is obvious that the major part of the time of all counsel was devoted to the factual issues. A part of these issues was resolved by agreement of the parties as a result of negotiations among counsel. Of the remaining factual issues, many were resolved by the court in defendants' favor. It does not appear that any allowance should be made for the time devoted to the factual issues.

I conclude that plaintiffs are entitled to a reasonable fee for research and presentation of the legal questions upon which plaintiffs prevailed. Obviously it is difficult to segregate the time expended in preparing briefs between legal research and the presentation of the factual situation on the basis of the depositions and exhibits. As noted supra, however, the major portion of the time of plaintiffs' counsel was expended in resolving and presenting the factual issues.

■ Taking all of the foregoing factors into consideration, I conclude that plaintiff Chemetron Corporation, as the successor in interest to the claims asserted by all of the plaintiffs, is entitled to an allowance of $4,000.00 as attorney fees.

*Delivery of Stock*

The court's memorandum opinion contains the following: "The plaintiffs of course are entitled to only one recovery for their claims. They have agreed to turn over to the defendants, upon payment of their claims, the shares of stock which they received in the arrangement proceeding."

This conclusion was based upon the following statement in plaintiffs' reply brief: "Upon payment in full by the surety of the amount due plaintiffs, plaintiffs will deliver to the surety the shares of stock which it received from the bankruptcy court, which will fully comply with the plaintiffs' obligation under the equitable principle of subrogation."

The judgment proposed by plaintiffs contained no provision with reference to the stock. In a letter to counsel the court suggested that the judgment should be amended to make provision for delivery of the stock.

Plaintiffs very properly have raised the question of whether the court had in mind a provision for delivery upon payment of the judgment or when plaintiffs have received the full amount of the claims allowed in the bankruptcy proceedings.

Plaintiffs filed claims in the bankruptcy proceedings totalling $60,827.70, and the claims were allowed in that amount. Shares of stock were issued to plaintiffs on the basis of two shares for each dollar of the claims, as allowed.

**668**

The amount allowed by the court in this action was $42,236.54.

Plaintiffs contend that they should be permitted to retain possession of the stock until the bankruptcy claims are paid in full; or that in any event the defendants should be entitled to no more than the proportionate number of shares which the amount they paid bears to the total of the plaintiffs' claims in the arrangement proceedings.

 I agree with the latter alternative, i. e., that the judgment should provide that upon payment of the amount of the judgment, the plaintiffs deliver to the defendants stock on the basis of two shares for each dollar paid on the judgment, or a total of 89,573 shares.

The general rule upon which plaintiffs rely in their supplemental memorandum may be summarized as follows: If a surety is liable for or pays only a part of a creditor's claim against the bankrupt it can not participate in remedies available to the creditor or receive dividends from the bankrupt estate until it "pays the whole debt or it is otherwise satisfied." American Surety Co. of New York v. Westinghouse Electric Mfg. Co., 1935, 296 U.S. 133, 137, 56 S.Ct. 9, 11, 80 L.Ed. 105. See also Home Indemnity Co., v. F. H. Donovan Painting Co., 8 Cir. 1963, 325 F.2d 870; and United States Fidelity & Guaranty Co. v. Centropolis Bank of Kansas City, Mo., 8 Cir. 1927, 17 F.2d 913, 917, 53 A.L.R. 295. The court has no quarrel with this rule but it does not aid the plaintiffs in this case.

Under the terms of the order confirming the arrangement plan plaintiffs as unsecured creditors of Idaho-Maryland received the stock in "cancellation, extinguishment, and full settlement" of all claims against the bankrupt. Thus, the debts, as between plaintiffs and the bankrupt, were fully satisfied and discharged. As I understand the arrangement and confirmation order, nothing further in the way of payment of the original claims will be forthcoming from the bankrupt's estate. Any future payments will be in the form of dividends from the stock issued in settlement of the creditors' claims. The plaintiffs still have all rights against the defendants as surety, subject to a proper adjustment with respect to the stock upon payment by the surety.

It is apparent that the purpose of the rule, i. e., to prevent the surety from reducing the protection of the bond through competition with the creditor for dividends from the assets of the debtor does not come into play here. The debts have been "otherwise satisfied" and the equities now require that defendants be subrogated to plaintiffs' rights in the stock to the extent of the amount paid on the judgment.

Plaintiffs will prepare, serve and lodge revised judgment consistent with the foregoing and incorporating changes agreed upon by the parties.